# THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. THE NORTH RIVER SUGAR REFINING COMPANY, Appellant.

*A manufacturing corporation which, with other corporations and individuals, enters into, and gives control of the business to, a trust association in order to prevent competition and raise the price of its products, will be dissolved in an action brought for that purpose by the State — acts of stockholders and trustees in the premises.*

In an action brought by the State to vacate the charter of a manufacturing corporation, organized under the general manufacturing act (chap. 40 of the Laws of 1848), it appeared that the corporation, while engaged in the business of refining and selling sugar, syrups and molasses, entered into a combination with certain other corporations and individuals engaged in the like manufacture, by which the management of their affairs was placed under the control of a voluntary association composed of eleven persons, with the intention that the corporations were still to maintain their separate organizations and carry on and conduct their respective businesses, subject to the control and management of this association, which was to receive the earnings and profits of the business and the certificates of stock of the corporations, and was empowered to designate the dividends which could be proportionately distributed to the holders of certain certificates to be issued by this association, representing the shares of stock in the several corporations which had been heretofore held by such parties.

The ostensible purposes of this combination were to promote economy of administration; to give each refinery the benefit of all appliances and processes known to or used by others; to improve the quality and diminish the cost of production; to furnish protection against unlawful combinations of labor and against inducements to lower the standard of refined sugars.

This association was intended to include all the companies and firms of individuals engaged in this business in the United States.

*Held,* that by entering into this association the defendant practically renounced and abandoned the control which, through its board of trustees, it was to exercise over the management of its corporate affairs, and transferred such management to this voluntary association, and thereby completely abolished all power of competition between the corporations and individuals entering into this association.

That it was not necessary that it should be affirmatively asserted, in the agreement for the organization of the association, that its design was to control the sale and advance the price of sugar, syrups and molasses throughout the country as long as it might reasonably be inferred that this was the leading object or inducement in its creation.

That such purpose would be unlawful, and would justify the dissolution of a corporation entering into the association with that view.

*Shrewsbury, etc., Railway Company* v. *Northwestern, etc., Railway Company* (6 H. of L. Cases, 113); *Diamond Match Company* v. *Roeber* (35 Hun, 421); affirmed, 106 N. Y., 473) distinguished.

The intention of the law is that a corporation shall exercise and use the franchises conferred upon it, for the benefit of the public; and when it voluntarily declines to do that or places itself in a situation in which it may be prevented from so doing as a consequence of its voluntary action, it may be annulled in an action brought for that purpose by the State under the laws of which it has been incorporated. What acts on the part of the stockholders and trustees of a corporation would make it a party to such a combination although no formal writing to that effect was executed in its behalf.

Appeal by the defendant from a judgment entered, on the verdict of a jury rendered at the New York Circuit, in the office of the clerk of the county of New York, January 31, 1889, and from an order entered in said office on the same day, denying a motion upon the minutes of the court for a new trial.

The opinion delivered at the New York Circuit is printed as a note hereto.*

*The following opinion was delivered at the circuit:

Barrett, J. The questions to be decided in this case are whether the acts complained of are corporate acts, and, if so, whether such corporate acts are grounds of forfeiture within section 1798 of the Code of Civil Procedure. The people rest their case primarily upon the second and fifth subdivisions of this section, claiming under the second subdivision that the defendant has "become liable to be dissolved by the abuse of its powers," and under the fifth that it has exercised "a privilege or franchise not conferred upon it by law." The act complained of in this connection is the defendant's participation in a combination between the owners of certain sugar refineries. The combination comprises all the sugar refineries in this State, and, with few exceptions, in the United States. This vast combination is denounced by the people as a public menace, as preventive of competition, and as tending to control prices and create a monopoly. It is defended by the corporation as the mere individual act of its stockholders, in no wise binding upon it, and at all events as a harmless association, constituting nothing more serious than an unusually large partnership; in other words, a lawful blending of individual interests in a joint arrangement for mutual protection and benefit.

The first question, then, to be considered is whether the corporation, as such, has entered into this combination, for, if it has not, clearly it cannot be deprived of its franchises because of independent and several acts, however illegal, of its stockholders. To a proper appreciation and solution of this question the precise facts must be gleaned and the foundation of the transaction minutely analyzed. Such analysis will also and necessarily throw a clear light upon the purposes of the project, and thus aid in the solution of the second question, namely, whether the combination is the innocent association claimed by the defendant or the unlawful one charged by the plaintiff. Let us, then, consider the foundation of the combination. It rests upon a written agreement, which has been styled the "trust deed." At the time this deed was prepared sugar refineries in this State

*John E. Parsons, Charles P. Daly* and *James C. Carter* for the appellant.

*Charles F. Tabor,* attorney-general, and *Roger A. Pryor,* for the respondent.

Daniels, J.:

The judgment from which this appeal has been brought dissolved the defendant as a corporation previously formed and existing under the laws of this State. It was organized under chapter 40 of the Laws of 1848 as a manufacturing corporation, and its business was generally that of refining and selling sugar, syrups and molasses. It was incorporated for this object in February, 1865, and continued to carry on its business until the close of the year 1887. Before

and country were variously organized. Some were simple partnerships, others corporations. Evidently the first step contemplated by the author of the scheme was harmony in the fundamental business basis of each refinery. The combination never could have been successfully created upon the basis of a special or *quasi* partnership arrangement between partnerships and corporations. It was necessary, therefore, either to turn the corporations into partnerships or the partnerships into corporations. It did not require the astute mind that prepared this most original instrument to perceive that an aggregation of partnerships, with the dangers resulting from death and the exercise of individual power, would never effect safe and permanent cohesion. Accordingly we find, as one of the first provisions in the deed, and as the basis of the so-called trust structure, a condition, in substance, that the partnerships shall all be turned into corporations. This, in fact, was done, and thus several of these corporations were organized for the express purpose of creating the very shares of capital stock through which the combination was to be formed. Partners took on corporate garb, became shareholders, and as such fitted themselves to enter the combination within the terms of the deed. Having thus provided for uniformity of corporate existence, the deed specifies what is to be done by each of the corporations formed or to be formed. The corporations already formed agree for themselves, and the partnerships agree for those corporations which they are to form, that all the shares of the capital stock of all the corporations shall be transferred to a board consisting of eleven persons (named in the deed) as trustees, to be held by them and their successors strictly as joint tenants, subject to the purposes set forth in the deed. These purposes are declared to be:

1. To promote economy of administration and to reduce the cost of refining, thus enabling the price of sugar to be kept as low as is consistent with reasonable profit.

2. To give to each refinery the benefit of all appliances and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar.

that time, but in that year, a plan was formed and adopted for the formation of what was called the Sugar Refineries Company, to go into effect on the 1st of October, 1887. Its general object was to bring together the parties and corporations engaged in the manufacture, refining and sale of sugar, and to place their affairs under a board of eleven persons, subject to a further increase to the number of thirteen, having to a large extent the management and control of this business. The company, in this manner provided for, was not, neither was it intended to be, a corporation, but it was in the nature of a partnership or combination designed to include, as far as that should prove to be practicable, the companies and persons engaged in this business in the United States. Its objects were generally stated in the deed adopted for this purpose to be:

3. To furnish protection against unlawful combinations of labor.

4. To protect against inducements to lower the standard of refined sugars.

5. Generally to promote the interests of the parties hereto in all lawful and suitable ways.

This board is authorized to make by-laws, to appoint from its members a president, vice-president, treasurer and committees, and to prescribe their duties and powers. The board is thus clothed with a power co-extensive with the specified objects of the agreement, as applied to the business of each refinery, and it may confer the executive-working of that power upon a president or vice-president. Having thus formed the trust, named the trustees and specified their powers, the deed proceeds to indicate the persons for whom the trust is created, and the duties of the trustees with regard to such persons. The *cestuis que trustent* are, of course, the entire body of stockholders of the aggregated corporations. It will be observed that these stockholders do not sell a single share of their stock, yet they transfer the entire block to eleven gentlemen, who are thereafter to stand in their shoes. They would naturally look for some acknowledgment from their trustees of the receipts of their shares and of the obligations which the trust imposes. The deed proceeds to furnish this in the shape of what are termed trust certificates. These certificates are not to exceed $50,000,000, and are to be divided in 500,000 shares, each of $100. They are to be divided by the eleven trustees among the several refineries, in due proportion to the value of their respective plants, and the refineries are then to subdivide the blocks of certificates so assigned to them among the *cestuis que trustent*, in proportion to the stock of the corporation, which each *cestui que trust*, held prior to the transfer to the trust board. The form of the trust certificate is precisely like the certificate of stock in a corporation. The eleven trustees are not named, but are styled "The Sugar Refineries' Company," and each certificate specifies that it is issued under and subject to the provisions of the trust deed. The usual blank form of assignment and power of attorney is indorsed upon this certificate, with an addendum to the effect that the assignee, by accepting the transfer, assents to the terms of the trust deed.

(1.) To promote economy of administration and to reduce the cost of refining, thus enabling the price of sugar to be kept as low as is consistent with reasonable profit.

(2.) To give to each refinery the benefit of all appliances and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar.

(3.) To furnish protection against unlawful combinations of labor.

(4.) To protect against inducements to lower the standard of refined sugars.

(5.) Generally to promote the interests of the parties hereto in all lawful and suitable ways.

And the manner in which they were to be promoted and attained was to bring the several companies and parties into an association

---

To avoid confusion of thought, and to distinguish clearly between the eleven trustees constituted by the deed and the trustees of the various corporations, we will hereafter speak of the former as the "trust board" or "the trustees," and of the latter as "the directors."

Upon the acceptance of the trust certificates the original corporate shareholder ceases to hold any further relations with his particular corporation, and thenceforward he is treated as a shareholder in the trust board. He can no longer receive a dividend from his particular corporation, nor, indeed, can the latter ever again declare a dividend. Each corporation is thereafter bound by a special provision in the deed to pay over the profits arising from its business to the trust board. No discretion on that head is left in the directors of the various corporations. They cannot use any part of such profits for betterments or improved machinery, or increased capacity — certainly not without the consent of the trust board — but must pay over all the profits directly to the trustees. Nor can even the latter declare a dividend upon the trust certificates allotted to the shareholders of any one corporation, payable out of the profits received from such corporation. On the contrary, their duty is to blend all the profits received from all the corporations into one grand mass, and from that aggregation of profits declare such dividends as they in their judgment deem appropriate, to be proportionately distributed to the holder of each trust certificate.

To emphasize these positions it may be well to quote the precise language of the deed.

"The profits arising from the business of each corporation shall be paid over by it to the board hereby created, and the aggregate of such profits, or such amounts as may be designated for dividends, shall be proportionately distributed by said board, at such time as it may determine, to the holders of the certificates issued by said board for capital stock as hereinbefore provided."

Thus it will be seen that these dividends are not to be declared or distributed upon the aggregate capital stock of the corporations, which is to be turned over

under the articles or deed adopted for that purpose. Where the business was carried on by individuals, it was declared that they should become corporations, and, as such, associates under this plan. And while the corporations becoming parties to the agreement were still to maintain their separate organizations, and carry on and conduct their own business, that was to be done under the control and management of the association through the board selected to exercise its authority. That the corporations becoming parties to the agreement were not designed or expected, through the intervention of their own stockholders, to maintain their organization and carry on their business is quite evidently disclosed by other provisions of this deed or plan of association, for the stock of each of the corporations becoming in this manner associated was to be finally trans-

to and held by the trustees, but upon what might not inaptly, in view of these peculiar facts, be termed the trust board's capital stock, namely, the trust certificates.

Thus we have a series of corporations existing and transacting business under the forms of law, without real membership or genuinely qualified direction — mere abstract figments of statutory creation — without life in the concrete or underlying association. Every share of stock has been practically surrendered and vital membership resigned. With the transfer to the eleven trustees the shareholders cease to occupy the position of *cestuis que trustent* with regard to the directors of the various corporations   In lieu thereof they accept substituted membership in an unincorporated board, and an entirely new, independent and exclusive trust relation with the trustees of that board. Nor are the trustees, as transferees of the capital stock of the various corporations, in any just sense genuine members thereof. They have no beneficial interest therein. Dividends are not declarable thereon, and if they were would not be payable to them in their own right, nor as trustees for the shareholders in the particular corporation which had earned the dividend. Nor could the owners of the trust certificates, "proportionately distributed" to such corporate shareholders, follow such dividend and require the trustees to account to them therefor. Whatever dividends are to be declared by the trustees must be so declared and paid from the aggregate fund; and whatever rights the holders of such trust certificates may have, as against the trustees, can only be enforced by the totality of certificate holders, or a representative of that body. Again, the relation existing under the deed between the trustees of the trust and the directors of the corporations is not, as we have seen, the usual relation of shareholders and directors, but a strict contract relation. Ordinarily the directors of a corporation may use their honest judgment with regard to dividends, and also as to the judicious application of profits. Here, however, the deed treats the directors of the various corporations as mere agents of the trust board, and in unqualified terms requires them to "pay over the profits." The effect of this

ferred to this board of eleven members, and in its place shares were to be issued by the association and divided among the corporations and distributed to their respective stockholders, in the proportions previously held by them in the corporations themselves, and ultimately to the amount of the shares of the Sugar Refineries Company.

The earnings or profits of the business of the associated corporations were required to be paid over to the board, and that board was empowered to designate the dividend which should be proportionately distributed to the holders of the certificates issued by the board for its shares. And the certificates of stock of the corporations were to be held by this board, and it was empowered by the deed or plan only to transfer so much of them from time to time

would be the same, even if individual members of the trust board were also shareholders in the corporations. As such individuals they would transfer their shares to the board, and accept from the board their due proportion of the trust certificates. This board, as a board, takes all the shares of all the corporations, and the corporate shareholders, whether members of the trust board or not, by transferring their shares to these trustees, and accepting from the latter trust certificates, in effect, abandon their corporations, relinquish their powers as shareholders, resign their functions as corporators, and look solely to the trust board for future guidance, control and profit.

It is the first time in the history of corporations that we have heard of a double trust in their management and control — one set of trustees elected formally to manage the corporate affairs and a second set created to manage the first — the shareholders in seventeen corporations leaving their functions with regard to their regular directors to be thought out and performed for them by what amounts to a board of guardians.

Let us now look at the situation of the directors of the various corporations as pointed out in the deed. The statute requires that each director shall be a stockholder, consequently each director must own at least one share. But the deed requires the transfer to the trustees of every share in every corporation. Now, these trustees certainly cannot, under the terms of their trust, sell or pledge a single share of the stock thus held by them. This stock in their hands is substantially dead. It evidences no individual right. It measures no proportionate interest. In fact, it serves in the future no purpose whatever except to furnish the trust board with formal voting power to control the direction of all the corporations. It would seem to be impossible, therefore, to qualify the board of directors in the various corporations. The draughtsman, however, attempted to provide for this difficulty by the following provision :

" The said board may transfer from time to time, to such persons as it may be desired to constitute trustees or directors or other officers of corporations, so many

to such persons as it might be desired to qualify as trustees or directors or other officers of the corporations, and which were to be held by them "subject to the provisions of this instrument." No period of time was declared during which this association should continue to exist and manage the affairs of the corporations. But that it was intended to be of a durable character is evinced by the provisions made for the management of the business and for the selection and continuance in office of members of the board. They were first selected and named in the agreement, one class of which were to hold office for seven years, the second class for five years and the third for three years, and at the expiration of their respective terms of office their successors were to be elected for the term in each case of seven years. The association was plainly, therefore,

of the shares as may be necessary for that purpose, to be held by them subject to the provisions of this instrument. Such transfers may be executed by the president and treasurer of the board in behalf of and as attorneys for the board for that purpose, and to be retransferred when so requested by the board."

Here there is no pretense of a sale. The "necessary" shares may be transferred to such persons as the board may desire to constitute directors, to be held by such directors "subject to the provisions" of the trust deed, and to be "retransferred" when so requested by the board. This clearly bears out my previous observation that these corporations exist as creatures of the law and are conducting business under its authority without a single genuinely qualified director; in fact, without directors at all in the ordinary and legal sense. Every director in every one of the corporations is necessarily the mere creature and agent of the trust board. The share of stock put in his name is not his property, nor can a dividend ever be declared upon it to him or to any one else. For that very share a trust certificate has, in fact, already been issued to him or to some one else. Plainly, then, the holding of this lifeless share of stock by the director without beneficial interest and at the will of the board, "to be retransferred when requested," is not a compliance with the statutory requirements that the directors shall "respectively be stockholders in such company."

There is further evidence upon the face of the deed of the difficulties which surrounded the execution of the contemplated project. Each refinery might have had debts, and all probably had assets outside of its plant. It would have been impracticable to issue trust certificates in proportion to the capital stock of each company, for one company might be capitalized for much more than its real value, while another might be capitalized for less, and still another for its precise value. It was necessary, therefore, to distribute the trust certificates in proportion to the real value of each property. But here, again, there was a difficulty growing out of the complexity of mortgages upon the realty, floating debt and the posses-

intended to be one of a durable and continuing character. And from the members of the board it was empowered to appoint a president, vice-president, treasurer and secretary, and to create other offices and appoint persons to fill them. And also to designate the duties and prescribe the power of the several officers and committees of the association, and to "make by-laws." "And all the arrangments for meetings, elections and all details not herein specifically provided for shall be made by the board." The capital of the association was fixed at the sum of $50,000,000, a portion of which was to be retained to bring in other refining companies, but in every instance to be first incorporated, and make them parties to the agreement or plan. This instrument was subscribed on the 16th of August, 1887, by twelve different corporations and individual concerns, the defendant being

---

sion of raw material and other personal property. It was clear that the interests in the trust board, which were to be substituted for the corporate shares, must be proportioned upon the realty, fixtures and machinery of each company (freed from debt), exclusive of the transmutable stock and other personal property ; in other words, upon the naked plant. Accordingly, provision is made in the deed that each refinery and the corporation to which it belongs shall be freed from liability and indebtedness, by the parties interested in it ; or such parties, if the board shall approve, may provide in cash for such indebtedness or liability, leaving the same to stand at the pleasure of the board. So much for the debts. Then as to the assets other than the plant, provision is made for their appraisal by five of the eleven trustees, and the values thus fixed are to be paid in cash by the trust board to the treasurer of each corporation. Of course, all this involved the necessity of providing the trust board with the means of raising money, and it was undoubtedly with this view that, under the head of fiscal arrangements, authority was given to raise the necessary funds by mortgage, "to be made by the corporations, or either, any, or all of them, on their property, and by such other means as shall be satisfactory to such board."

This covers, in a general way, the methods adopted by the parties to produce cohesion as between themselves. But they did not stop there. Provision is made for the gathering in of every other existing refinery ("in every instance to be incorporated "), and, in fact, four others have joined the combination since the deed was signed by the original partnerships and corporations, and the evidence shows that in the entire country but five sugar refineries of the character in question remain outside of the combination. The trust board is also provided with additional means for adding recruits to the combination, and to facilitate general adhesion thereto. It was with this view that the fifteen per cent of the trust certificates allotted to each refinery was to be reserved, "subject to be disposed of by the board," for, among other purposes, the "acquisition of other refineries to become parties to this deed," and lest the accretions of membership

made a party to it at that time only by the signature of its secretary, and the power to do that was afterwards revoked.   Other corporations engaged in the business afterwards became parties to the arrangement aggregating finally seventeen different companies employed in this business, leaving in the United States certainly no more than six other companies or firms engaged in this business. The association therefore, appears to have been intended to include all the companies and firms of individuals engaged in this business in the United States.   And, so far as it should prove successful in associating them, it would completely extinguish all competition between the corporations becoming members of the association. Those who became parties to it were not only located in the State of New York, but in the State of Massachusetts, and apparently,

---

should exhaust this fifteen per cent as well as what might be derived through the exercise of the other powers of the board, the means is afforded of "from time to time" increasing the trust certificates even beyond the $50,000,000.   It is not strange that this extraordinary document should close with a provision for strict secrecy, that "the said deed shall not be shown or delivered to any corporation, firm, person or persons whatsoever, except by the express direction and order of the board."

We now come to the legal question — is this a combination of corporations or merely a combination of stockholders?   The defendant claims that unless authority to sign the trust deed, given by the directors of each corporation at a regular board meeting, is affirmatively proved, the acts complained of are not corporate acts. This contention ignores the fact proved in the case that the corporate acts provided for by the deed have actually been performed by the corporations, and that the deed has, in fact, been put in execution.   The proof shows that the deed was actually signed by the firms whose names appear to be appended thereto, and, as to corporations, by persons professing to represent them; that the firms were turned into corporations pursuant to the requirements of the deed; that the shares of capital stock of all the corporations (including the four that have since come in) were, with a single exception, transferred to the trust board; that the trust board has issued and distributed the trust certificates, and that a dividend of two and one-half per cent has actually been declared and paid upon such certificates.

Where did the trust board obtain the money with which to make that dividend? Necessarily from each corporation, under the provision that the profits arising from the business of each corporation shall be paid over by it to the board hereby created.   Such certainly is the fair implication from the fact of the receipt by the trust board of the necessary funds from the various corporations in connection with a deed purporting to be signed by their officers and containing this provision. Thus the corporations acted upon the deed and performed one of the most vital duties imposed upon them thereby.   Further, it appears that all the capital stock

from the names of the companies, in the State of Ohio, in Missouri, in the State of Louisiana and the city of San Francisco.

To maintain the action it was alleged that the defendant did become a party to this association or combination, although it revoked and withdrew the authority of its secretary to subscribe its name to the agreement. This was denied on behalf of the defendant, it being insisted, in support of the denial, that what had taken place was done by the stockholders of the company, as distinguished from its trustees and the company itself. And the further position has been taken, that the action proved to have been had by the stockholders was inoperative in the way of bringing in the defendant as a party to this combination. It is undoubtedly true, as the law was stated to be in *Pullman's Palace Car Company* v. *Missouri,*

---

of all the corporations was actually transferred to the trust board, not, as we have already seen, in severalty, nor as tenants in common, but as joint tenants. That at once necessarily disqualified every director in every corporation, unless, indeed, a single share was reserved or transferred to each of such directors under the authority of the clause of the trust deed to which we have referred. If that was done, and as these directors have continued to perform their ordinary functions, we must assume that it was done, then the deed again became an executed contract, and the directors held their offices or continued to perform their duties by the force of its provisions. Still further, we find a strong implication that mortgages were placed upon the property of some of the corporations, by corporate act, pursuant to the provisions of the deed. In the case of this particular defendant the stockholders, after resolving to join the combination, changed their mind and determined to revoke previous action looking to that end. Thereupon Mr. Searles, who is one of the eleven members of the trust board, offered them $325,000 in cash for their stock, with the additional privilege of working up all the raw material on hand and making what they could out of it. This was accepted and the bargain carried out. Mr. Searles received the shares representing the naked plant, denuded of stock, raw material and other assets, and the shareholders received $325,000 and what they had made out of everything save the plant. Now, Mr. Searles was not acting for himself alone, but evidently for the persons as well who had signed the deed. He tells us how the $325,000 was raised as follows: Q. Whose money paid this $325,000? A. * * * Three gentlemen, who were trustees of certain funds, paid for the stock. Q. What funds? A. Funds received by them (these three gentlemen, trustees) for mortgages and other matters connected with the organization. Q. What organization? A. The Sugar Refineries Company. Q. What we call the board, you mean? A. Yes.

Now, as the only mortgages connected with the organization were mortgages upon the property of the corporations, it would seem to follow that the defendant's stock was, in effect, purchased under the provision of the deed authorizing

etc., *Railway Company* (115 U. S., 587), that while the stockholders of corporations, in a general sense, own its property, they "are not the managers of its business, or in the immediate control of its affairs. Ordinarily, they elect the governing body of the corporation, and that body controls its property." (Id., 597.) And that this was the scheme generally under which the defendant was incorporated appears from the act. of 1848 and its various amendments. But it is far from following, from the existence of this general principle, that the defendant did not become a party to this association and agreement. That it intended to become such party appears from the minutes of the meeting of its stockholders held on the 22d of April, 1887. For a resolution was then adopted empowering three persons who were members of its board of trustees, as "a committee to make

---

the raising of funds "by mortgage to be made by the corporations, or either, any or all of them, on their property." It is apparent that this was corporate combination. It was a purchase for such corporate combination of corporate property by corporate means.

It also appears, in connection with this particular defendant, that Mr. Searles, immediately after the purchase of the stock, became its president and treasurer, put in new directors, and at once, for reasons satisfactory to himself, discontinued the business. From that hour to this the defendant's refinery has been closed, and yet a dividend has been declared upon the very trust certificates which were issued to Mr. Searles by the board upon the transfer to it of the defendant's capital stock. Mr. Searles, as president and treasurer of the defendant, knew of that dividend, and as one of the trust board helped to declare it. He knew, also, that it was realized from the profits of the going corporations, and that the defendant had not contributed a penny to the fund from which he was to be paid.

It really seems unnecessary to dwell further upon this subject. The accumulation of evidence points irresistibly to the complete practical identity of shareholders and corporations, and it is quite impossible to sever the acts of the persons solely interested in these corporations from that of the corporations themselves. The purpose to effect corporate combination cannot be disguised. The form of the contract veil was thin enough, but the acts under it sweep away the gauze and leave the corporate body unclouded and in full view. Mr. Searles was, indeed, substantially right when he told us that after his purchase of the defendant's entire stock he "was the North River Sugar Refining Company."

The law on the subject is in harmony with the fact. According to the act of 1848, the signers of the original certificate of incorporation and their successors "are a body politic and corporate, in fact and in name, by the name stated in such certificate." Who are the successors of these original signers? The shareholders, of course. The entire body of shareholders thus constitute the corporation. "A corporation or a body politic or a body incorporate," says Mr. Kyd, "is a collection of many individuals united into one body under a special denomination, having perpetual succession under an artificial form and vested by the policy of

arrangements to perfect the said consolidation in behalf of the North River Sugar Refining Company, with full power to act and to sign all contracts and agreements in the name of the said North River Sugar Refining Company, of whatever name or nature, concerning the said consolidation." And further authorizing the president and secretary of the comprny " to sign all contracts, agreements and papers which the above-named committee may make in relation to the said consolidation." And it was under this authority that the secretary did subscribe the name of the corporation to the deed or agreement. On the 4th of November, 1887, another meeting of the stockholders of the defendant was held, in which the proceedings of the previous meeting were referred to, and revoking the powers thereby conferred upon the president and secretary, and discharging the

---

the law with the capacity of acting in several respects as an individual." (1 Kyd on Corp., 13.) It is really an association of persons, and the word corporation is but a collective name for the corporators or members. (1 Morawetz on Corp., §§ 1, 227, 474) ; *People* v. *Assessors* (1 Hill, 620). The shareholders, vested with the corporate powers, are the body corporate, corporation or company. (Taylor on Corp., § 50.) Chief Justice MARSHALL, in *Providence Bank* v. *Billings* (4 Peters, 562), said that the great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men. Mr. Morawetz puts it clearly when he says that "while a corporation may, from one point of view, be considered as an entity, without regard to the corporators who compose it, the fact remains self evident that a corporation is not in reality a person or thing distinct from its constituent parts." (Sec. 1.) And so the acts of the collective body are the acts of the corporation, and if unlawful, will work a forfeiture.

In *The People* v. *Kingston etc.*, *Turnpike Company* (23 Wendell, 205), Chief Justice NELSON, in a *quo warranto* proceeding, declared that "though the proceeding by information be against the corporate body, it is the acts or omissions of the individual corporators that are the subject of the judgment of the court." And this is entirely reasonable. For what is the corporation apart from the whole body of the members or stockholders, clothed with the statutory franchises ? Merely a name. When the whole body of stockholders offend the law of the corporate being, the corporation offends. And who is punished by forfeiture or dissolution because of such offending ? Not the mere corporate name, but the persons who have actually offended and who have thereby forfeited the franchise which they possessed under the corporate name. The directors are but the agents of the corporation to manage its affairs and carry out the purpose and object of its formation. They are only authorized to do such things as are directly or impliedly directed or authorized by the charter. (*Abbot* v. *American Hard Rubber Co.*, 33 Barb., 591, citing Ang. & Ames on Corp., § 280.) The directors of this defendant could not have bound the

committee from further consideration of the subject, and canceling and annulling the preceding resolutions.   But that it was designed to decline in this manner to become a party to the deed and the association appears not to have been the fact.   For a further meeting was held by the stockholders of the company on the 25th of November, 1887, at which it was finally resolved, through a committee of three selected for that purpose, to deliver the stock of the company "to John E. Searles, Jr., or, at his request to John E. Parsons, John R. Dos Passos and Franklin Bartlett, trustees, on receipt of the sum of three hundred and twenty-five thousand dollars, the proceeds to be divided among the stockholders of this date according to their respective shares."   This resolution was carried unanimously by the votes of the persons present, who included all the stockholders in

corporation by an assent to the deed in question.   That deed involved momentous changes in the life and destiny of the corporation, and in the relations of its shareholders, which were entirely foreign to the general management of its business.   Such changes are essentially for the consideration of the corporators themselves, and their united act in the premises (purporting both in the agreement itself and in all the surrounding circumstances to be corporate) is plainly the act of the artificial body composed, in the concrete, of themselves.   Having thus concluded that the acts under consideration were corporate acts, the remaining question is, were they illegal ?   This question may be divided into two branches:   First.   Had the corporations authority to enter into any partnership arrangement, however innocent in itself — such, for example, as would have been perfectly lawful between individuals ?   Second.   Was this combination of the latter character, or was it inherently unlawful — such, for example, again, as would have been unlawful between individuals ?

The answer to the question as presented in the first branch must be in the negative.   It cannot be doubted that the arrangement in question amounted to a partnership between these corporations or a substantial consolidation.   Such was the effect of the massing of all the stock of all the corporations, and the correlative massing of all the profits of all the corporations.   The intention was clearly to share both profits and losses.   Such, too, was the effect of uniting all the corporations under practically a single control.

It is well settled that corporations cannot consolidate their funds or form a partnership unless authorized by express grant or necessary implication; nor can they enter into any arrangement amounting to a practical consolidation or copartnership. (Angell & Ames, § 272; Taylor, §§ 305, 419, 420; Green's Brice, 416; 1 Morawetz, 376-421, and cases there cited; *New York and Sharon Canal Co.* v. *The Fulton Bank*, 7 Wend., 412; *Whittenton Mills* v. *Upton*, 10 Gray, 582; *Marine Bank* v. *Ogden*, 29 Ill., 248.)   In the Fulton Bank case, Chief Justice SAVAGE said that " general principles are against the power of corporations to do such acts.   They have no

the company with the exception of two, but who were stated, in fact, to have consented to the delivering up of their stock. The design did exist, therefore, to transfer the entire stock of the company to the person or persons named in the resolution. And it was proved by what afterwards took place that this transfer was intended to make the defendant a party to the association. For pursuant to the resolution the stock was so transferred to Mr. Searles, who was a member of the board of the Sugar Refineries Company, and it was transferred by him to that board. And certificates of shares in that company were issued to him in place of this stock, and divided and distributed among the stockholders of the defendant, meeting, acting, voting and consenting in this manner to the consolidation of their company. What was delivered to the stockholders in the defendant by

---

powers, but such as are granted and such as are necessarily incident to the grant made to them. Corporations at common law have certain powers, but not such as would authorize the forming of a partnership or the consolidation of two companies into one." It was doubtless because of the recognition' of this principle that the acts of 1867 (chap. 960) and 1884 (chap. 367) were passed, authorizing consolidations in a certain specified manner and under fixed conditions. The corporations whose conduct we are considering have not taken advantage of these acts, doubtless because such acts are limited to corporations organized "under any general or special law of this State"— the promoters of the present combination evidently desired to combine all the refinery corporations in the Union, and they have sought, by the scheme under review, to effect a far broader and deeper purpose than mere corporate consolidation under these acts. In doing so they have plainly abused their powers and have exercised privileges not conferred upon them by law. As legal conclusions, forfeiture of the defendant's franchise and dissolution justly follow.

Mr. Morawetz states the rule with precision (2 Mor. on Cor., § 1024) : "A corporation may incur a forfeiture of its franchises by the doing of an illegal act. Any act of a corporation which is forbidden by its charter or by a general rule of law, and strictly every act which the charter does not expressly or impliedly authorize, is unlawful; and if the doing of such act is an injury to the public, it may be sufficient ground of forfeiture."

The same rule is laid down in Kent, Taylor, Waterman, Kyd, Angell & Ames and Green's Brice. (2 Kent, 312; Taylor, §§ 289, 457, 459; 2 Waterman, § 427; Kyd, § 479 *et seq.* ; Angell & Ames, §§ 774; 775, 776; Green's Brice, 708, 709 [3d ed.], 787.) Waterman says that "the State is not required to prove an actual injury; it is sufficient cause of forfeiture if the act be such as in the nature of things is calculated to produce injury." The cases all hold the same doctrine, laying down the general rule that the corporate franchises are granted upon a trust or condition that the corporate privileges shall not be abused; that the corporation

way of certificates in the Sugar Refineries Company was precisely what they were entitled to have under the plan or agreement made for the association of these manufacturing companies.   The stipulations upon that subject were all fully observed and carried into effect.   And from what transpired in this manner, and the fact that only corporations could enter the association, it is evident that the intention was to make the defendant, in its corporate capacity, a party to this association or combination, as the deed or agreement provided that might be done, but without adding its formal signature to the instrument itself. And that it could be made a party to the association or combination, in this manner, results from the authority delegated by and vested in the persons who acted upon the subject.   For they not only included all the stockholders, who owned the legal entity known as

undertakes and agrees, upon condition of forfeiture, that it will so manage and conduct its affairs that it shall not become dangerous or hazardous to the safety of the State or community in and with which it transacts business (*Ward* v. *Farwell*, 97 Ill. 593); and that the franchise may be forfeited and the corporation dissolved for acts *ultra vires*, or for a breach of the trust condition and perversion of the objects of the grant.   (*Chicago Life Ins. Co.* v. *Needles*, 113 U. S., 574; *People* v. *Dispensary*, 7 Lans., 306; *People* v. *Bristol, etc., Turnpike Co.*, 23 Wend., 235; *People* v. *Fishkill*, 27 Barb., 447; *State* v. *Railroad Company*, 45 Wis., 590; *Ches. and Ohio Canal Co.* v. *Balt. and Ohio, R. R. Co.*, 4 Gill & Johns., 1, 106, 121.)   These rules rest upon the inherent rights of sovereignty.   The franchises whether resulting from general or special laws, are grants from the sovereignty of the people.   Benefit to the country at large, from the objects for which the corporations are created, constitute the consideration, and in most cases the sole consideration of the grant.   (Chief Justice MARSHALL, in the *Dartmouth College Case*, 4 Wheaton, 518, 637.)   It, therefore, follows logically, that when these objects are perverted, when the country suffers injury instead of receiving benefit, the State, because of such misuser, may withdraw the privileges and resume its franchises.

We might rest upon the conclusion thus arrived at, for it is sufficient to entitle the people to a verdict.   As, however, the second branch of the question was fully argued and is fairly up, it becomes my duty to consider it.   At the outset let me say, that the modification by modern jurists of some of the rules laid down in the old English cases is fully recognized.   The liberty of contracting is the most important factor of commercial life, and it should only be abridged when it is clear that the public must be injuriously affected by its unrestrained exercise in a particular case.   Freedom of all kinds may be abused, and commercial freedom, as well as any other, may degenerate into license.   The development of judicial thought in regard to contracts in restraint of trade has been especially marked.

the corporation (*Twin Lick Oil Co.* v. *Marbury,* 91 U. S., 587, 589, 590), with the two exceptions already mentioned, owning but eighteen shares of the stock, but they also included every member of the board of trustees of the defendant. They all acted together in this manner, trustees and shareholders, the former in both capacities, as they lawfully could (*Paulding* v. *Chrome Steel . Co.,* 94 N. Y., 335, 341), and, with the two exceptions already mentioned, voted to transfer the stock of the company in this manner to Mr. Searles, who was an officer of the board in substantial, though not literal, compliance with the proposals contained in the deed or agreement which had been devised and adopted for this object. The effect of what they did through their committee, who were also a majority of the trustees, was to irrevocably place all the

---

The ancient doctrine upon that head has been weakened and modified to such a degree that but little, if any of it, is left. In *The Diamond Match Company* v. *Roeber* (106 N. Y., 473), it was held that "a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties." It was also held that a restraint of trade was not general, but partial, though covering the whole country with the exception of Nevada and Montana. Indeed, excessive competition may sometimes result in actual injury to the public, and anti-competitive contracts, to avert personal ruin, may be perfectly reasonable. It is only when such contracts are publicly oppressive that they become unreasonable, and are condemned as against public policy. (*Horner* v. *Graves,* 7 Bing., 735.)

But all the cases, ancient and modern, agree that a combination, the tenaency of which is to prevent general competition and to control prices, is detrimental to the public, and consequently unlawful. This seems to be conceded by one of the learned counsel for the defendant. Judge DALY sums up the result of his examination of the cases in these words: "That combinations are unlawful, the design and effect of which necessarily is to give the party combining a monopoly more or less, for any length of time, of the manufacture or sale of a commodity * * * or to regulate and control the price of a commodity, * * * or to secure any pecuniary advantage in restraint of trade which would be injurious to the community."

Now it seems to me to be entirely clear that the agreement which has been previously analyzed brings the case conspicuously within the above rule. It is not a case where a few individuals in a limited locality have united for mutual protection against ruinous competition. It is the case of great capitalists uniting their enormous wealth in mighty corporations and utilizing the franchises granted to them by the people to oppress the people. First, they utilize the corporate franchises to guard themselves against the dangers incident to personal association; and,

stock of the defendant in the hands and subject to the control of
the Sugar Refineries Company, to receive, through its board, shares
in that company in place of the stock in this way surrendered, and
to permanently place the business and control of the defendant
wholly under the dominion of the board through its authority to
designate the defendant's future trustees and officers, and to transfer
to the persons selected for those officers such shares of stock only
as would be necessary to render them eligible under the law.
These persons, acting together in this manner as trustees and stock-
holders, not only had the authority, so far as that could be exer-
cised, of making the defendant a party to the association, but they,
as a matter of fact, by what transpired, did make it such a party,
and subjected it as completely to the power and control of the

---

second, they centralize these franchises in a single, gigantic and irresponsible
power furnished with every delegated facility for regulating and controlling at
will, not only in the State but throughout the entire country, the production and
price of a particular and necessary article of commerce. When I say an irrespon-
sible power, I mean no reflection upon the gentlemen personally in whom the
power is vested. I mean a body of individuals who, in their trust capacity, are
entirely outside of the corporate being, and are subject to no legislative authority.

Combinations that were pigmies in comparison with the present have been
repeatedly denounced by the courts and pronounced to be unlawful, as tending to
breed monopolies. (*Hooker* v. *Vandewater*, 4 Denio, 349; *Stanton* v. *Allen*, 5 id.,
434; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Penn. St., 186; *Salt Co.* v. *Guthrie*,
35 Ohio St., 672; *Craft* v. *McConoughy*, 79 Ill., 346; *Hoffman* v. *Brooks* 11 Weekly
Law Bulletin, 258.)

In *Hooker* v. *Vandewater* it was held that an agreement between the proprietors
of five lines of boats, engaged in the business of forwarders on the Erie and
Oswego canals to run for the remainder of the season at certain rates for freight
and passage then agreed upon, and to divide the net earnings among themselves
in certain proportions, was a conspiracy to commit an act injurious to trade, and
consequently void. The object expressed in the agreement was the "establishing
and maintaining fair and uniform rates of freight and equalizing the business
among themselves, and to avoid all unnecessary expenses in doing the same." Of
this JEWETT, J., observed: "The object of the agreement, as expressed in the
written contract, was plausible enough, but it is impossible to conceal the real
intention." He adds "to destroy which rivalry and keep up the price to certain
rates fixed by themselves was the great, if not the sole, object of the agreement."

*Stanton* v. *Allen* was a very similar case where the court, without considering
the conspiracy statute, held that the agreement was void at common law as con-
travening public policy and injurious to the interest of the State.

In *Morris Run Coal Company* v. *Barclay Coal Company* the combining mines

board of the Sugar Refineries Company as though the deed or plan of the association had, in the most formal manner, been subscribed under the authority of the board of trustees of the defendant. There is no ground, therefore, to support the position that the defendant did not become a party to this combination. The persons entitled to exercise control over it and manage its affairs consented and resolved to make it a party; and they did make it a party and carried out all the arrangements required for that purpose in conformity, with the solitary exception of subscribing it, to the formal provisions of the agreement made for the association and combination of these corporations.

And by this proceeding they practically renounced and abandoned the control which, through its board of trustees, they were to exer-

---

were not the only ones in the region, much less in the country. It appeared that there was another mine in the region not within the combination, but that the product of that mine could only reach the market (sought to be controlled) by tide-water. It also appeared that there were other mines in two other counties of the State, though the quantities taken from them were small. Still the court held that the combination was not only illegal, but was a criminal offense. The common-law origin of this doctrine was dwelt upon — that while an individual may do many things to oppress others, which, though morally wrong, are not the subject of legal discipline, he cannot lawfully combine with another to do the same things. The wrong which, when done by the individual, cannot be redressed, becomes a conspiracy the moment it is effected by two or more in combination. As the learned Judge (AGNEW) observed. "The combination has a power in its confederated form which no individual action can confer. The public interest must succumb to it, for it has left no competition free to correct its baleful influence."

In *Salt Company* v. *Guthrie* the agreement was between the producers of salt in a limited locality. The court held the agreement void, although the price of the commodity had not been unreasonably advanced. The tendency of the agreement was sufficient; the court remarked that it was "no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public.

In *Craft* v. *McConoughy* the agreement was between all the grain producers in but a single town. It was held to be void, the court saying that "while the agreement on its face would seem to indicate that the parties had formed a copartnership for trading in grain, yet from the terms of the contract, and the other proof in the record, it is apparent that the true object was to form a secret combination and enable the parties, by secret and fraudulent means, to control the price of grain." There is no distinguishing significance, however, in the use of the word

cise over the management and business of the corporation, and transferred it to the board of the Sugar Refineries Company, and with the other associates thereby completely abolished all power of competition between these companies. That was an abandonment of the authority vested in this corporation by the statute for its management and government, and the delegation and transfer of that management and government to a body of men entirely distinct from that designated by the statute for the control and management of the corporation. By these acts it ceased to exercise the functions prescribed by law, and placed the corporation under the dominion of an authority unknown to the statute. And it thereby offended against the provisions of the act by and under which it had been created, and for that reason it is asserted to have

---

fraudulent in this connection, as the only fraud in the case was the general fraud upon the public involved in making purchases of land and property to aid the combination and render it invincible. This case, too, is directly opposed to the ingenious distinction sought to be made between a limited product and things capable of being produced in indefinite quantities.

*Hoffman* v. *Brooks* is also an instructive and well-reasoned case. The combination there was between sellers of tobacco for the purpose of destroying competition among themselves. It was held to be unlawful, the court using the pointed language: "The presumption is always against the validity of such agreements." And they will not be enforced "where they include all those engaged in any business in a large city or district, are unlimited in duration, and are manifestly intended, by the surrender of individual discretion, by the arbitrary fixing of prices, or by any of the methods to which the hope of gain makes human ingenuity so fruitful, to strangle competition outright and breed monopolies."

The cases where anti-competitive agreements were upheld had none of the distinguishing characteristics of monopoly, but were plainly fair contracts entered into for mutual protection, and were not injurious to the public; such, for instance, as *Ontario Salt Company* v. *Merchants' Salt Company* (18 Grant's Ch. [U. C.], 540); *Wickens* v. *Evans* (3 Y. & J., 318); *Mogul Steamship Company* v. *McGregor* (L. R., 15 Q. B. D., 476; 4 Ry. & Corp. L. J., 611); *Skrainka* v. *Scharringhausen* (8 Mo. App., 522).

In the Canadian case first cited the learned vice-chancellor declared that "it was out of the question to say that the agreement had for its object the creation of a monopoly, as the parties were not the only persons engaged in the production of salt in the province," and after examining the particular facts of that case, he adds: "What is this more than two persons carrying on the same trade binding themselves not to undersell each other?'

*Wickens* v. *Evans* was still freer from the element of monopoly. The agreement was confined to three trunkmakers, who divided England into three districts, each taking one and limiting himself to one. The court said that the restraint of trade

become liable to this action for its dissolution. (Code Civil Pro., § 1798, sub., 1.) But it is not requisite to place the disposition of the case solely upon the effect to be attributed in this manner to what was shown to have taken place, for it is to be inferred from the provisions inserted in and made a part of the deed or agreement, and accepted in this manner by the defendant, that this association or combination, of the parties engaged in this business, was intended to bring about and secure ulterior advantages in the way of advanced profits to the associates themselves, and the persons who had received their certificates of shares of the Sugar Refineries Company. It has not, it is true, been in words asserted in the deed or agreement that the association was designed to control the sale of sugars, syrup and molasses throughout the country. Neither was it necessary that it

was but partial, and that there was no monopoly except as between the three parties, "because every other man may come into their districts and vend his goods."

The Mogul Steamship Company case, though cited by the defendant, seems to be strongly against its contention. The action was in equity, and an injunction to restrain the wrong was refused. Lord COLERIDGE placed his judgment entirely upon the adequacy of the legal remedy and the consequent impropriety of equitable inference. But, assuming the allegations of the bill to be true (which question of fact was not then passed upon), he denounced the so-called "conference" as a criminal and indictable conspiracy, and therefore actionable. "It is clear," he observed, "that supposing the allegations here could be established in point of fact, the damages in such a case might be extremely heavy. They might be what are called exemplary, or vindictive, damages; such, indeed, as it might severely tax the resources of the conference to pay. That, I think, cannot be denied."

It seems that the plaintiffs acted on this suggestion of Lord COLERIDGE, and brought an action at law, in which, however, they were again unsuccessful. The judgment here was also pronounced by Lord COLERIDGE (*Mogul Steamship Co.* v. *McGregor*, 57 L. J. R. [Q. B. D.], 541), who ruled that as there was no evidence of malice or personal ill-will, the plaintiffs could not recover. The learned chief justice held that the conference" was not unlawful merely because it offered a rebate of five per cent upon all freights paid by those shippers who shipped their cargoes on board conference vessels alone, to the exclusion of the plaintiff's vessel. "It seems to me," said Lord COLERIDGE, "that it was no more in restraint of trade, as that phrase is used for the purpose of avoiding contracts, than if two tailors in a village agreed to give their customers five per cent off their bills at Christmas on condition of their customers dealing with them, and with them alone."

Even there, however, Lord COLERIDGE said that if there had been personal malice or ill-will, he did not doubt that the action would lie.

In the Missouri case cited the agreement was upheld because the restraint was partial. "The partial nature of the restraint in the case before us," said the court, "seems to be not colorable, but real. The agreement is amongst the

should be so stated, as long as that may reasonably be inferred to have been a leading object or inducement to the creation of the association itself. And the case was so tried as to allow that inference to be followed.

For at the close of the evidence given upon the trial each party applied to the court to dispose of the action by a direction for a verdict. Neither suggested or claimed that any question of fact had been presented which should be submitted to the jury, and the court, acting upon these applications, directed a verdict in favor of the plaintiff, holding, under the evidence, that an unlawful combination had been entered into by the defendant and these other companies to control the production and sale of sugar in the country; and if that conclusion may be supported by way

---

quarry men of one district of one city, and it does not appear that it embraces all of them. The contract is not of such a nature that it is apparent from its terms that it tends to deprive men of employment, unduly raise prices, cause a monopoly or put an end to competition." While the judgment in this case sustained the agreement, because it was inoffensive as thus limited, the opinion of the court is exceedingly strong in its condemnation of agreements tending to monopoly. "So far," continues the court, "as the odious nature of monopoly is concerned, that has become more apparent as commerce has increased. The danger to be apprehended from the accumulation of wealth and power in the hands of great corporations, and the abuses by which large capitalists may so combine as to relax or destroy competition in trade, are matters of public concern, and the essential question is one of monopoly and of injury to the public."

The same danger is clearly pointed out by our own Court of Appeals in the late case of (*Leslie* v. *Lorillard*, 110 N. Y., 519), where GRAY, J., speaking of agreements in restraint of trade, observed: "In later times the danger in such agreements seems only really to exist when corporations are parties to them, for their means and strength would better enable them to buy off rivalry and to create monopolies." And again, speaking of corporations: "If allowed to engage, without supervision, in subjects of enterprise foreign to their charters, or if permitted unrestrainedly to control and monopolize the avenues to that industry in which they are engaged, they become a public menace; against which public policy and statutes design protection."

The principles established by these cases seem to cover and fully meet the main position taken in support of the present agreement. There are, however, one or two minor considerations which should be noticed. The first is, that this agreement seems to avoid the pitfall of many of the cases by carefully omitting any specific authority to fix prices. Such authority, however, is plainly covered by the enormous general power conferred upon the trust board. The greater includes the less, and any specification on this head would have been superfluous. Even Mr. Carter finally yielded this point. "I agree," he says, "in the broadest manner, that the power

of inference from the provisions contained in the agreement and the evidence given upon the trial, the direction was right, for the court was at liberty under these applications to draw the same inferences from the proofs which the jury would have been justified in drawing if the case had been submitted as a matter of fact to them. (*Stratford* v. *Jones*, 97 N. Y., 586; *Provost* v. *McEncroe*, 102 id., 650.) Whatever presumptions or inferences, therefore, may be deduced from the evidence were then, and are now, to be adopted, so far as that may be a necessity, for the support of the verdict and judgment.

The law does not require that instruments of this description, before they may be declared to be illegal, shall, in plain language, affirm the intention to be to prevent competition and control the market, or advance the prices of necessary commodities, as the articles

---

exists there to fix a price; eventually, it is for the interests of the parties to fix the price." The truth is, that under this agreement the trust board can direct the business movement of these seventeen or eighteen corporations as absolutely as the general of a great army can direct the movements of its various *corps d'armee*. But a director may rebel, say the learned counsel. Well, even in war there is a possibility that a corps commander may disobey the orders of his chief, but discipline and change of military agency speedily follow. There is still less likelihood of mutiny in boards of directors who practically take office under the trust board (and subject to the provisions of the trust deed), who are appointed by the trust chiefs and removed by a mere retransfer of stock "upon request" at any time, and above all, who are spurred to active and zealous obedience by the hope, nay, by the substantial certainty, of gain. For there is nothing whatever to prevent the trustees from filling these corporate boards with their own members or with other holders of their own trust certificates.

The trust board is, indeed, clothed with power far in excess of the ordinary stockholders of a corporation. It is, in substance, both stockholders and directors, and this union of force embraces every share of stock and every director in every corporation. What need, then, for specific detail in the general delegation of power? The board, under this executed deed, can close every refinery at will; close some and open others; limit the purchase of raw materials (thus jeopardizing and in a considerable degree controlling its production); artificially limit the production of refined sugar; enhance the price to enrich themselves and their associates at the public expense, and depress the price when necessary to crush out and impoverish a foolhardy rival; in brief, can come as near to creating an absolute monopoly as is possible under the social, political and economic conditions of to-day.

We are told that this cannot be accomplished with regard to an article like sugar, which can be indefinitely produced by the application of capital and labor, and that monopoly is impossible only where the supply of the article is restricted by nature. This position has been maintained in an argument of exceeding

of sugar, syrups and molasses clearly are. If it did, it would, by that requirement, supply a device for evading its wholesome restraints and rendering its principles utterly nugatory. That has never been exacted. But the courts, as in other cases, are permitted to place themselves in the position of the parties entering into the agreement or arrangement to discover the objects or designs by which they may have been actuated. (*Woodruff* v. *Woodruff*, 52 N. Y., 53.) It was there said: "We must consider the situation of the parties, the subject-matter of the contract and the surrounding circumstances, with a view of ascertaining the purpose and intent of the parties." (Id., 57.) And *Knapp* v. *Warner* (57 N. Y., 668) supports this statement of the law. The language of the instrument, therefore, is not alone to be consulted, but it is to be consid-

---

brilliancy, which I confess to have enjoyed as one always enjoys a persuasive manner of presentation. But while the argument was most ingenious, it was neither sound nor, I say with respect, plausible. Of course, a monopoly in the strict, technical, and absolute sense cannot be thus created, but a monopoly in a legal sense can. The monopoly with which the law deals is not limited to the strict equivalent of royal grants or people's patents. Any combination, the tendency of which is to prevent competition in its broad and general sense and to control, and thus at will enhance prices to the detriment of the public, is a legal monopoly. And this rule is applicable to every monopoly, whether the supply be restricted by nature or susceptible of indefinite production. The difficulty of effecting the unlawful purpose may be greater in one case than in the other, but it is never impossible. Nor need it be permanent or complete. It is enough that it may be even temporarily and partially successful. The question in the end is, does it inevitably tend to public injury ?

Why, then, does not this trust board combine all of these unlawful purposes with ample power of accomplishment? Theoretically, it cannot prevent other capitalists from coming forward and utilizing their means in combination with labor, but practically it can. The struggle would be an unequal, and, except under powerful, unusual and extraordinary conditions, impossible. A vast harvest could be reaped at the expense of the public before the foundation of the competitive edifice could be thoroughly laid. Nor could the power of the combination be defeated by outside forces. The undue enhancing of prices might draw to the locality the attention of the foreign commercial world. But the argument here overlooks the laws of the United States and the duties imposed by those laws upon imports. It overlooks, too, the expense of transportation and handling, and the delays incident thereto. The harvest could again be reaped at the public expense before the advent of competition, and that harvest could then be utilized, by the sudden lowering of prices, to the repression of the foreign competitor. Such, at least, is the tendency of the combination, and such its practical power.

ered in view of these circumstances and of the conduct and probable motives of the individuals engaged in bringing it about.  And all that may be implied in this way from the agreement is to be considered, as contained in it, for the purpose of discovering what was intended to be accomplished.  (_Jones_ v. _Kent_, 80 N. Y., 585, 588.)

By the application of these rules to this case the leading object is disclosed, with a reasonable degree of clearness, to be that the affairs and business of the combination or association should be so managed and carried on as to promote the profit and gain of the associates. The board, indeed, was expressly authorized to promote the interests of the parties in all suitable, as well as lawful, ways, and to provide for all details not specifically mentioned; and that comprehends the power to prescribe and regulate the selling prices of the articles to

The defendant's whole argument on this head is based upon theory rather than fact, just as its earlier argument with regard to the corporation is based upon legal form rather than substance.

The doctrines of political economy which have been pressed upon us are based upon normal conditions, and have no bearing whatever upon combinations organized for the express purpose of surmounting and subverting those conditions.

Lastly, this appeal to the law is criticised as an interference with a natural state of things.  The unnatural thing is said to be the law, when it attempts to check the natural order.  Unfortunately for this argument, it is the combination which has resorted to what it calls the unnatural thing.  It was not content with natural partnerships or associations of individuals, but resorted to the device of corporate artificiality to effect its ends.  Having asked and accepted the favor of the law, it cannot complain that it is taken to task for grossly offending its letter and spirit.

Fortunately, the law is able to protect itself against abuses of the privileges which it grants.  And, while further legislation, both preventive and disciplinary, may be suitable to check and punish exceptional wrongs, yet there is existing, to use the phrase of a distinguished English judge in a noted case, "plain law and plain sense" enough to deal with corporate abuses like the present, abuses which, if allowed to thrive and become general, must inevitably lead to the oppression of the people and ultimately to the subversion of their political rights.

Again the legal results justly follow, forfeiture and dissolution.

Let me say, in conclusion, that it would quite unnecessarily belittle the discussion of this momentous question to consider the minor charges presented by the people.

The judgment should rest upon the broad and main issue.  There it rests with a sense of fitting proportion; and there it should be left.

For these reasons, the defendant's motion must be denied and the plaintiff's granted.

be produced. And where the effect of the arrangement is to permanently secure the control, or the substantial control, of this product and of its sale, as that has been done, it is no more than just to infer that the control is to be used to avoid competition and enhance prices, and in that manner, as it is the ordinary expedient for that end, promote the interests and add to the profits of the associates. In this case it was a leading object to combine together the different corporations and individuals engaged in this business, not only in and about the city of New York, but throughout the country, and to secure that control by a substantial organization for an indefinite period of time. This was not to be done, and was not, in fact, done for an idle purpose, or merely to furnish the means of protection against unlawful combinations or for any other mere economical object,. but it was manifestly to place this business within the control and subject to the dictation of this association and of the board selected for the government of its affairs. And after putting forth the efforts necessary to secure that end, it would not only be idle, but absurd, to indulge in the supposition that it was not intended to wield the authority, in this manner secured, for the pecuniary advantage of the associates. And the direct and usual way in which that is accomplished, following out the common impulses of practical business men, is by the advancement of the prices of the commodities manufactured and sold, in the course of the business whose control may be in this way secured. When the opportunity to do that is provided, human selfishness is sure to turn it to a profitable account. A jury, certainly, would be fully justified in concluding, from the agreement and the other facts in evidence in the case, that the governing object of the association was to promote its interests and advance the prosperity of the associates, by limiting the supply, when that could properly be done, and advancing the prices of the products produced by the companies. To conclude otherwise would be to violate all the observations and experiences of practical life. This is a controlling feature in this controversy. And that it was intended to be secured by the organization provided for, and which actually took place, is reasonably free from doubt. And where that appears to be the fact, the agreement, association, combination or arrangement, or whatever else it may be called, having

for its objects the removal of competition and the advancement of prices of necessaries of life, is subject to the condemnation of the law, by which it is denounced as a criminal enterprise. The law at this time, as it has for many years in this State, has made it a misdemeanor for two or more persons to conspire " to commit any act injurious to the public health, to public morals or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the law." (Penal Code, § 168, subd 6.) And combinations and associations of this form have been held, in this and other States, to violate these provision of the statute, so far. as they prohibit acts injurious to trade or commerce.

In *Stanton* v. *Allen* (5 Denio, 434) this precise point was presented under the same statute as it was then a part of the general laws of the State. And it was there held that an association of boat proprietors on the canals, though not including all of them, under an agreement to regulate the price of freight by uniform scales, to be fixed by a committee chosen by themselves, and to divide the profits of their business according to the number of boats employed by each, was unlawful. For it was considered that the effect of the association or agreement was to increase prices and prevent competition in the business to which it related. A similar point came before the court in *Hooker* v. *Vandewater* (4 id., 349), and the same ruling was made by the court. In *Morris Run Coal Company* v. *Barclay Coal Company* (68 Penn., 173), the coal companies entered into an agreement in this State to divide two coal regions of which they had the control ; to appoint a committee to take charge of their interests, which was to decide all questions and appoint a general agent through whom the coal mined was to be delivered ; each corporation to deliver its proportion at its own cost in the different markets at such time and to such persons as the committee might direct, which was to adjust the prices and rates of freight and enter into agreements with other companies, and by which the five companies might sell their coal themselves only to the extent of their proportion and at prices adjusted by the committee ; and the agent to suspend shipments by either beyond their proportion, the prices to be averaged and payments made to those in arrear by those in excess, and neither to sell coal otherwise than as agreed upon. And this agreement was held by the court, under the statute already referred to, to be void

and incapable of being carried into effect. It was held to contemplate a business arrangement injurious to the trade and commerce of the State, and for that reason incapable of being legally supported. This case as well as the others are direct authorities against the legality of the association to which the defendant was made a party. The only substantial difference between the cases is that arising out of the fact that in those referred to the parties had expressed by their agreement what in this case was left to be plainly inferred from it, and from the circumstances attending the consummation of the arrangement, that it was part of the object in view to regulate prices, and in that manner promote the interests of the associates in the sale of their productions. In *Arnot* v. *Pittston, etc., Coal Company* (68 N.Y., 558), a quite similar case was brought before the courts in this State. And the agreement there made, including no other essential attributes than those which, by plain inference, are attached to the present case, was held, for the reasons already mentioned, to be illegal and void. In the opinion which was then delivered it was said : " That a combination to effect such a purpose is inimical to the interests of the public, and that all contracts designed to effect such an end are contrary to public policy, and, therefore, illegal, is too well settled by adjudicated cases to be questioned at this day." (Id., 565.) And in support of this conclusion the case just mentioned, decided in the State of Pennsylvania, is cited with approval. A like combination between producers and dealers in salt was, in the same manner, condemned in *Salt Company* v. *Guthrie* (35 Ohio St., 666). And so it was in *India Bagging Association* v. *Kock* (14 La. An., 168) where an agreement was made between several commercial firms for three months not to sell India cotton bagging without the consent of the majority. The court in its decision held that "the agreement between the parties was palpably and unequivocally a combination in restraint of trade, and to enhance the price in the market of an article of prime necessity to cotton planters." (Id., 169.) In *Denver, etc., Railroad Company* v. *Atchison, etc., Railroad Company* (15 Fed. Rep., 650) the same rule was followed. And so it was in *Hilton* v. *Eckersley* (6 El. & Bl., 47). The action was there upon a bond to carry into effect a similar arrangement, and it was held by the court to be void, and that the suit could not be sustained. In *West Virginia Transportation Company* v. *Ohio Pipe Line Company* (22 West

Va., 600) it was held by the court that " the common law will not permit individuals to oblige themselves by a contract either to do or not to do any thing, when the thing to be done or omitted is, in any degree, clearly injurious to the public. (Id., 617.) And that was further maintained in *Western Union Telegraph Company* v. *American Union Telegraph Company* (65 Ga., 160). And it was again followed in *Hazlehurst* v. *Savannah, etc., Railroad Company* (43 Ga. 13). And *Craft* v. *McConoughy* (79 Ill., 346) ; *Raymond* v. *Leavitt* (46 Mich., 447) ; *Colles* v. *Trow, etc., Company* (11 Hun, 397) ; *Watson* v. *Harlem and New York Navigation Company* (52 How. Pr., 348) ; *Faulds* v. *Yates* (57 Ill., 416) ; *Foll's Appeal* (91 Penn., 434), are pointedly to the same effect. And so is the theory maintained in *Gibbs* v. *Baltimore Gas Company* (130 U. S., 396), for there combinations and associations, having in view the advancement of the prices of necessary commodities for the benefit of the associates, were held to be illegal. And this also secured the approval of the court in *Alger* v. *Thacher* (19 Pick., 51). That case, it is true, differed materially from the facts here presented, but the court incidentally, and apparently with propriety, added that the principle proceeded upon was especially " applicable to wealthy companies and large corporations who have the means, unless restrained by law, to exclude rivalry, monopolize business and engross the market. Against evils like these, wise laws protect individuals and the public by declaring all such contracts void." And this was expressly sanctioned in *Stewart* v. *Erie and Western Transportation Company* (17 Minn., 372), where it was concluded to be " against the general policy of the law to destroy or interfere with free competition, or to permit such destruction or interference." (Id., 395.) And *Wright* v. *Ryder* (36 Cal., 342) sustains the same principle ; and so does *Murray* v. *Vanderbilt* (39 Barb., 141). In *Keene* v. *Kent* (4 N. Y. St. R., 431), the association was to advance the price of lard by in part withholding from the market that which was owned or controlled by the associates. And it was held by this court that the agreement was void and incapable of being enforced in a court of justice. In all these cases the reservation of the power to control the prices of necessary products, whether by express agreement or fair implication, has been condemned as unlawful.

A large class of cases has been cited and relied upon in support

of the appeal permitting a limited division or mutual regulation of certain business interests, but they do not seem to be applicable to this controversy, for neither of them maintains the validity of a combination or association made between corporations or individuals engaged in the production and sale of necessary articles, through which competition is to be avoided, and the prices of such articles to the consumers are to be advanced. The case of *Diamond Match Company* v. *Roeber* (35 Hun, 421, affirmed 106 N. Y., 473), and all other similar cases, are entirely distinguishable in principle from this controversy. And it was considered so in the decision made in the last case by the Court of Appeals, where it was said that " combinations between producers to limit production and to enhance prices are or may be unlawful, but they stand on a different footing." (Id., 483.) The facts of the case of *Shrewsbury, etc., Railway Company* v. *Northwestern Railway Company* (6 H. of L. Cas. 113), where the agreement between the different railway companies was maintained, has been given prominence as sustaining the combination now under examination. But while that case sustained the agreement which was there made for the limited management of different railways, it is not to be followed as an adjudication having controlling weight over this controversy. For it was not understood, or intended to be held by the courts in which that case was examined, that an association or combination of this description, extending as it does from the Atlantic to the Pacific coast, and obviously designed to advance the price of necessary commodities of life, could be maintained. In fact, the opposite principle was conceded when this case was decided by the Court of Queens Bench (21 L. J., Q. B., 89), for it was there added, in the course of the opinion, that if the parties by their agreement proposed to endeavor to prevent a competition generally, there might be weight in the objection that it was injurious to the public, by giving the plaintiff a monopoly. (Id. 93.) The leading cases, *Collins* v. *Locke* (L. R., 4 App., 674); *Master Stevedores' Association* v. *Walsh* (2 Daly, 1); *Wickens* v. *Evans* (3 Young & J., 318); *Central Shade Roller Company* v. *Cushman* (143 Mass., 353) and *Marsh* v. *Russell* (66 N. Y., 288) are so far diversified in their facts from the leading and controlling circumstances in this case as to be inapplicable to it; and that may also, with propriety, be said of *Leslie* v. *Lorillard* (110 id., 519), as well as the still

later case of *Fowle* v. *Park* (131 U. S., 88). This controversy is within the authority and principles of the other adjudications which have been mentioned so distinctly and entirely as to render it only necessary to depend upon and follow them for its disposition.

As the facts have been developed, the association or combination into which the defendant has, in this manner, entered, was created for an unlawful object. And it has, by making itself a party to that association, renounced and abandoned its own duties for the transaction and management of its business, and placed its interests and affairs under the dictation and control of a board which legally should have no power over it, and rendered itself liable to the judgment which has been recovered in this action. And the possibilities that other business enterprises in the same pursuit may be set on foot to counteract the effect of this combination will not relieve the defendant from this result. That, in view of the large capital and extended combination already secured, is a very remote probability, for other manufacturers brought in competition with this combination could easily be driven from the field of trade by it and its paramount control still maintained and perpetuated. And the probability that its power would be used in this manner is so decidedly fortified by experience that capital would be reluctantly placed at the risk of loss by other persons with so formidable a competitor to be encountered. But if it should be otherwise, the law will not tolerate or excuse the combination; for the interposition of third persons, in no way connected with it, to counteract its effects, is no excuse or justification for the wrong this combination has in this manner committed. A wrong-doer is never excused for the consequences of his wrong, for the reason that other parties, not acting under his direction or authority, may interpose and in a measure defeat the consequences of the wrong. Evidence was given upon the trial tending to prove that the property previously used by the defendant in its business was intended to be taken as a public park by the authorities of the city, and thereby to excuse the cessation of its business, and that proceedings for that object had been instituted. But while those may be the facts it is still to be inferred, from the other evidence upon the trial, that its business was not discontinued by reason of the expectation that the property would be appropriated by the city for

this object, but that it was done under the power of this combination to discontinue its productive use, and in that manner diminish the manufacture of refined sugar, which it had previously carried on, to the extent of from two hundred and seventy-five to three hundred thousand pounds of sugar a day; and this view is confirmed by the fact that it was allowed to participate in the two and one-half per cent dividend declared for the five months preceding the April mentioned in his evidence by Mr. Searles. The company has been subordinated, and its own individual usefulness as a manufacturing competitor terminated by the power of this combination; and as it was voluntarily placed there, to this extent its own franchises have been subverted and for the time being ended, and it became liable to the judgment which has been recovered against it in the action, for it is a condition on which a corporation is allowed to be created and maintained that it shall exercise and use its franchises for the benefit of the public; and when it voluntarily declines to do that, or places itself in a situation in which that may be prevented as a consequence of its voluntary action, there, under the statute as well as the decisions of the courts, it may be annulled at the suit of the attorney-general. (Code Civil Pro., § 1798; *People* v. *Utica Ins. Co.*, 15 Johns:, 358; *People* v. *Trustees*, etc., 5 Wend., 211; *Whitney Arms Co.* v. *Barlow*, 63 N. Y., 63; *Penn. R. R. Co.* v. *St. Louis*, etc., *R. R. Co.*, 118 U. S., 290.)

What was there said concerning the action of the railway company is equally as applicable to this controversy. And that is that " unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company, for a long period of time, its roads and all its appurtenances, the use of its franchises, and the exercise of its powers, nor can any other railroad company, without similar authority, make a contract to receive and operate such road, franchises and property of the first corporation, and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter." (Id., 309.) To this effect, also, is *People ex rel McKinch* v. *Bristol*, etc. (23 Wend., 222); *People* v. *Hillsdale*, etc., *Turnpike*

*Road* (Id., 254); *People* v. *Phœnix Bank* (24 id., 431); *National Bank* v. *Matthews* (98 U. S., 621). And *Bank* v. *Whitney* (103 id., 99), approves of the same principle. And it has been in no manner disaffirmed by *Slee* v. *Bloom* (5 Johns. Ch., 366), which, however, was reversed in 19 Johnson, 456. And to the like effect as the other authorities is *State* v. *Farmers' College* (32 Ohio St., 487) and *State* v. *People's Mutual Benefit Association* (42 id., 584). It was substantially for these reasons that the verdict was recovered against the defendant upon the trial. The defendant had disabled itself from exercising its functions and employing its franchises, as it was intended it should by the act under which it was incorporated, and had, by the action which was taken, placed itself in complete subordination to another and different organization to be used for an unlawful purpose, detrimental and injurious to the public; instead of manufacturing its product and disposing of it to the public on what might be fair competitive prices, it had become a party to a combination, in part, at least, designed to create a monopoly, and exact from the public prices which could not otherwise be obtained. This was a subversion of the object for which the company was created, and it authorized the attorney-general to maintain and prosecute this action to vacate and annul its charter. The action was well sustained by the facts which the evidence supported, and the judgment, for the reasons already mentioned, as well as those assigned by the judge presiding at the trial, should be affirmed.

BRADY, J., concurred.

VAN BRUNT, P. J.:

For the reasons contained in the written opinion, and also for those contained in the opinion of Mr. Justice BARRETT, who presided at the trial, I am of the opinion that the judgment appealed from should be affirmed.

Order affirmed, with ten dollars costs and disbursements.