JOHN ARNOT, Jr., Respondent, *v.* THE PITTSTON AND ELMIRA COAL COMPANY, Appellant.

Where one producer of a commodity, for the purpose of enhancing the price, enters into a contract with another producer, binding the latter to withhold and keep out of the market his supply, the contract is against public policy and void.

While a vendor of goods may, under certain limitations, recover for their price, notwithstanding that he knew the vendee intended an improper use of them, so long as he did nothing to aid in such use, yet if he has done any thing beyond making the sale to aid the illegal plan of the purchaser, he cannot recover.

Defendant and the B. C. Co. were corporations engaged in mining and selling coal at or near Pittston, Penn. Defendant also had a coal depot at Elmira, the chief market for coal in western New York, from whence was supplied a large extent of country north and west. For the purpose of monopolizing the trade and to maintain an unnaturally high price, the two companies entered into a contract by which defendant agreed to take all the coal which the B. C. Co. should desire to send north of the State line, not exceeding 2,000 tons per month, at the regular market price, less a commission of fifteen per cent, and the B. C. Co. agreed not to sell coal to any party other than defendant to come north of the State line. The product of the B. C. Co. largely exceeded 2,000 tons per month. Defendant had made similar contracts with all the other mining proprietors. Of these, however, the B. C. Co. did not have actual notice. The B. C. Co. delivered coal and made advances under the contract during the first month and then refused to carry it out further. In an action by plaintiff, as assignee of the claim of the B. C. Co. under the contract, to recover the agreed price for the coal and the moneys advanced; *held,* that the contract was against public policy as in restraint of trade and so void; that the agreement of the B. C. Co. not to sell to others, it knowing that the object of defendant was to create a monopoly, and that this was one of the means of averting competition, made it a party to the illegal scheme of defendant; that the legal and illegal stipulations in the contract were dependent and inseparable; and that a rescission or repudiation of the contract after part performance did not authorize a recovery for the partial performance.

Also, *held,* that the facts did not show a rescission, as the action was simply to enforce the claim so far as it had accrued under the contract, and it was this claim only that was assigned to plaintiff.

*Arnot* v. *Pittston and Elmira Coal Co.* (2 Hun, 591) reversed.

(Argued December 19, 1876; decided March 20, 1877.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, affirming a judgment in favor of plaintiff entered upon the report of the referee. (Reported below, 2 Hun, 591.)

This action was brought by plaintiff as assignee of the claim of the Butler Colliery Company, for 2,700 tons of coal, alleged in the complaint to have been sold by said company to defendant at an agreed price, and for moneys advanced, less $411.07 commissions. The referee found, in substance, the following facts:

Said company and defendant were corporations, engaged in the business of mining and vending anthracite coal, at or near Pittston, Pennsylvania. Defendant also had a depot for coal at Elmira, Chemung county, New York, and was there largely engaged in the vending of anthracite coal, the production of the Pittston mines, and in distributing it by canal and railway from Elmira to dealers and consumers through a very large extent of country north and west of that point. Elmira was then connected with Pittston by canal, which was in that season the chief means of transportation from the mines to Elmira, which was then the chief market for coal in western New York, and there prices for coal were established for the extensive district aforesaid.

On the third day of August, 1869, an agreement in writing was made and entered into between the said The Butler Colliery Company and the defendant, containing these provisions:

"Agreed this 3d day of August, 1869, by and between The Butler Colliery Coal Company, party of the first part, and The Pittston and Elmira Coal Company, party of the second part, as follows, to wit:

" First. The said party of the second part hereby agrees to take all the coal the party of the first part desires to send north of the State line, not exceeding two thousand tons per month, at the regular market-price established from time to time, by the 'Wyoming Coal Exchange,' less fifteen cents per ton commission to be allowed by the said party of the first part.

" Second. Settlements shall be made on the tenth of each month for all the coal delivered during the preceding month, and the payments made either in cash or approved paper, the option being with the said party of the first part."

" Fifth. This agreement is to take effect immediately and continue during the season of canal navigation for 1869, when it shall terminate."

. " Ninth. The said party of the first part hereby agrees not to sell coal to any other party than to the party of the second part, to come north of the State line during the continuance of this agreement."

At the time of the execution of said agreement, the production of the Butler Colliery Company's mines was largely in excess of two thousand tons of anthracite coal per month. The object and purpose of the defendants in making said contract was so to control the shipment and supply of coal for the Elmira market, as to maintain an unnaturally high price of coal in that market, and to prevent competition in the sale of coal therein, and but for the purpose of accomplishing that purpose, the defendant would not have entered into said contract with the Butler Colliery Company, of all which the latter corporation, at the time of making said agreement, had notice.   As a further means of accomplishing the same purpose the said defendants had made contracts adapted to promote the same purpose with all the other mining proprietors at Pittston, of which fact the Butler Colliery Company did not have actual notice.   The price agreed to be paid for the coal by the first clause of said agreement, was the regular market price of coal at Pittston.   Pursuant to said agreement the Butler Colliery Company delivered to the defendant at Pittston, between the 3d and 28th days of August, 1869, the coal charged in the complaint, at the prices therein stated, and made advances of money to and for the use and benefit of the defendant, on and about the shipment and delivery of said coal, for which, on the 10th day of September, 1869, there was due from the defendants to the Butler Colliery Company, according to the terms of said contract, after deducting $411.07 com-

missions as provided therein, the sum claimed in the complaint. After the delivery of said coal, and before the 1st day of September, 1869, the Butler Colliery Company gave notice to the defendant that it would not deliver more coal to the defendant under or pursuant to said contract, and did rescind the said contract, and did thereupon and at all times afterwards refuse to deliver more coal to said Pittston and Elmira Coal Company, all without reason or excuse.

The Butler Colliery Company, by an instrument in writing, duly executed, assigned and transferred to the plaintiff its claim for bill of coal sold, and advances made under the agreement.

During the month of September, 1869, the Butler Colliery Company began the shipment of coal by canal to Elmira, and after the 3d day of October, 1869, made large sales of coal north of the boundary line between the States of New York and Pennsylvania, which was the " State line referred to " in the agreement hereinbefore set forth, and continued to make such large sales until the close of canal navigation.

As conclusion of law the referee found that plaintiff was entitled to judgment for the amount claimed.

*H. Boardman Smith* for the appellant. The agreement was a conspiracy, which rendered all the parties to it liable to indictment. (2 R. S., 69, § 8 ; 4 Den., 352 ; 68 Pa. St., 174 ; 5 Den., 434 ; 2 Wheel. Cr., 262 ; 1 id., 142 ; 2 Colby, 34, 36 ; 14 Wend., 14 ; 4 id., 228 ; 2 Mass., 337, 538, 112 ; 6 id., 74 ; 9 id., 415 ; 3 S. & R., 220 ; 4 Metc., 111 ; 1 City H. Rec., 169 ; 7 Bost. L. R., 58.) The agreement was void as against public policy. (14 N. Y., 181 ; 31 id., 476 ; *Richardson* v. *Crandall,* 30 How., 142 ; 2 Arch. Cr. L., 1072 ; *Burt* v. *Place,* 6 Cow., 431 ; *Darmoth* v. *Bennett,* 15 Barb., 543.) The maxim " *ex turpi causa non oritur actio,*" applies with like effect to a contract merely *malum prohibitum* · as to one *malum in se.* (*Staples* v. *Gould,* 5 Seld., 520 ; 26 Barb., 601 ; *Ex parte Dysler,* 2 Rose, 351 ; *Aubert* v. *Maze,* 2 B. & P., 374 ; 14 J. R., 273 ; *Thalhemer* v. *Brinkerhoff,* 20 id., 397 ;

7 Wend., 280; 43 N. Y., 277; 10 Paige, 118; *Jarvis* v. *Peck*, 1 Hoff. Ch., 479; *Sar. Co. Bk.* v. *King*, 44 N. Y., 87; Story on Sales, §§ 486, 496, 504.)    The Butler Colliery Company was "*in pari delicto*" with defendant in this transaction. (44 N. Y., 87, 94; 15 Barb., 541; *Tracey* v. *Talmadge*, 14 N. Y., 162; 18 id., 244; *Jaques* v. *Golightly*, 2 W. Bl., 1073; *Jaques* v. *Wilty*, 1 H. Bl., 65; *Williams* v. *Hedley*, 8 East., 378; 11 Mass., 368; 22 Pick., 181; 23 id., 24; 3 Metc., 581; 7 J. R., 434; *Oneida Bk.* v. *Ont. Bk.*, 21 N. Y., 496; *S. H. Bk.* v. *Codd*, 18 id., 244: *Pepper* v. *Haight*, 20 Barb., 430; 8 id., 439; 3 Seld., 328; Story on Sales, 505–507; Story on Contracts, 624, 625.)

*John Murdock* for the respondent.    If defendant suffered by the rescission of the contract its only remedy is to recoup its damages.    (*Snooks* v. *Fries*, 19 Barb., 313, 416; *Winne* v. *McDonald*, 39 N. Y., 233; *Tipton* v. *Feitner*, 20 id., 423, 433; *Grant* v. *Johnson*, 5 id., 253; *Parmalee* v. *O. and S. R. R. Co.*, 6 id., 741; *Clinton* v. *Hope Ins. Co.*, 45 id., 454; *Glacius* v. *Black*, 50 id., 145; 2 Pars. on Con., 193; *Sickels* v. *Pattison*, 14 Wend., 257; *Swift* v. *Opdyke*, 43 Barb., 275; *Selden* v. *Pringle*, 17 id., 458; *Pepper* v. *Haight*, 20 id., 440.) The contract being divisible the court will disregard the bad and sustain the agreement upon the good consideration and enforce it.    (1 Pars. on Con., 380, 381, note J; 2 id., 253; 2 Kent's Com. [m. p.], 468, and note [11th ed.]; Add. on Con., § 147; Story on Con., § 459; Chitty on Con., 694, 1001, and note; 3 Comst., 37; Metc. on Con., 246, 254; 8 T. R., 411; 8 East, 231; *Erie R. Co.* v. *U. L. Wks.*, 6 Vroom [N. J.], 240; 18 Penn., 50; *Leavitt* v. *Palmer*, 3 N. Y., 37; *Oneida Bk.* v. *Ontario Bk.*, 21 id., 491; *Curtis* v. *Leavitt*, 15 id., 12; *Hardin* v. *Hyde*, 40 Barb., 440; *Leavitt* v. *Blatchford*, 5 id., 10; *Pepper* v. *Haight*, 20 id., 438; *Sanderson* v. *Goodrich*, 46 id., 618; *Grant* v. *Johnson*, 5 id., 161; *Mackie* v. *Cairns*, 5 Cow., 547, 564; Coke's Litt., 206*a*–218*a*; *Thomas* v. *Hewett*, 1 Salk., 170; *McAllen* v. *Churchill*, 11 Moore, 483; *Mallen* v. *Day*, 2 M. & W., 274; *Wallace* v. *May*, 11 id., 653; *Green* v. *Price*,

13 id., 695; *Cheesman* v. *Nainby*, 2 Rayns., 1456; 1 Hoff. Ch., 479; *Jarvis* v. *Peck*, 10 Paige, 119; *Alcock* v. *Giberton*, 5 Duer, 76; *Tracy* v. *Talmage*, 14 N. Y., 181; *Siger* v. *Daniels*, 8 Alb. L. J., 45; *Evans* v. *Harris*, 423.) The contract was not illegal as a restraint in trade or otherwise. (*Van Martin* v. *Babcock*, 23 Barb., 633; Chitty on Con., § 112; 2 Pars. on Con., 258, and note; Story on Con., §§ 547, 550, 552, 553; 23 Barb., 633; 10 N. Y., 244; 1 Cow., 77; 6 Hill, 217; Comyn on Con., p. 1, chap. 4, § 55; id., chap. 10, § 438; 2 Chitty on Con., 407; *Michel* v. *Reynolds,* 1 P. Wms., 181; *Gale* v. *Reed*, 8 East, 80; 21 Wend., 157; 7 Cow., 309.) The Butler Colliery Company, although a *particeps criminis*, still if not *in pari delicto*, could recover back the coals delivered on the contract if it was disaffirmed and rescinded. (4 Barb., 524, 527; 20 id., 438; 14 N. Y., 123; 15 id., 12; 21 id., 491; 22 id., 260; 2 Kent's Com., 468, and note [11th ed.].) Its acts would not subject it to a penalty.. (5 Cow., 547; 8 id., 20; 7 J. R., 434; 19 id., 1.) It being a foreign corporation, was not chargeable with knowledge of the laws of this State or indictable for violating them. (*Bank Chil.* v. *Dodge*, 8 Barb., 233; 9 Pick., 112; 3 Shep., 45; 5 Seld., 53.) ·

RAPALLO, J. This action is brought to recover the price of about 2,700 tons of coal, sold and delivered to the defendant by the Butler Colliery Company in the month of August, 1869. The plaintiff claims under an assignment from the last-named company.

The findings of the referee establish that this coal was delivered pursuant to a contract between the two companies, dated August 3, 1869, and the defence mainly rests upon the alleged illegality of that contract. The referee has found that the circumstances under which the contract was made were as follows:

The Butler Colliery Company was a Pennsylvania corporation, engaged in mining and vending coal, at or near Pittston, Pennsylvania. The defendant was also a Pennsylvania corporation, engaged in the same business, but in addition

had a coal depot at Elmira, New York, where it was largely engaged in vending anthracite coal, the product of the Pittston mines, and in distributing it, by canal and railway, from Elmira, to dealers and consumers, through a very large extent of country north and west of that point. Elmira was connected with Pittston by canal, and was the chief market for coal in western New York, and prices of coal were there established for the extensive district before mentioned.

The purpose of the defendant in making the contracts in question was so to control the shipment and supply of coal for the Elmira market as to ·maintain an unnaturally high price of coal in that market, and to prevent competition in the sale of coal therein, and, but for that purpose, the defendant would not have entered into the contract in question with the Butler Colliery Company. Of all these facts the Butler company had notice at the time of making the agreement.

As a further means of accomplishing the same purpose, the defendant had made contracts adapted to promote it with all the other mining proprietors at Pittston. Of these contracts the Butler company did not have actual notice.

The agreement in question, entered into for the purpose which has been stated, was as follows : The defendant agreed that it would take all the coal which the Butler company should desire to send north of the State line, not exceeding 2,000 tons per month, at the regular market-price established from time to time by the Wyoming Coal Exchange, less fifteen per cent per ton commission, and that settlements should be made on the tenth of each month for all the coal delivered during the preceding month.

The Butler Colliery Company agreed that it would not sell coal to any party other than the defendant, to come north of the State line, during the continuance of the agreement, which was during the season of canal navigation for 1869.

The other provisions of the agreement related to mere matters of detail, not affecting the legal question involved.

It is found as a fact in the case, that the product of the Butler Colliery Company largely exceeded 2,000 tons per month.

It cannot escape observation that by this agreement the Butler Colliery Company did not agree to sell or deliver to the defendant all of the product of its mines, nor any specific quantity or proportion thereof. It was entirely optional with it whether or not to deliver any coal to the defendant. But the defendant did agree to take all the coal which the Butler company might desire to send north, to the extent of 2,000 tons per month. This undertaking would have been utterly void for want of mutuality, had it not been for the agreement of the Butler company that it would not sell coal to any other party, to come north of the State line. The only consideration for the agreement of the defendant to take of the product of the Butler company to the extent of 2,000 tons per month, consisted in the stipulation of that company not to sell to any one but the defendant. Without that stipulation, the paper called a contract would have amounted to nothing. Neither party would have been bound to deliver or accept any coal. That stipulation was all that gave vitality to the contract.

Bearing in mind the fact found, that the product of the Butler company's mines was largely in excess of 2,000 tons per month, the object of the agreement is plain. The defendant, without binding itself to take the whole product of the mines of the Butler company, endeavored by this agreement to keep all of the coal of that company out of the market, except the limited amount which it agreed to take, and thus to artificially enhance the price of that necessary commodity. This purpose was the basis of the whole agreement, and, as is found by the referee, was understood by both parties at the time of entering into the contract.

That a combination to effect such a purpose is inimical to the interests of the public, and that all contracts designed to effect such an end are contrary to public policy, and therefore illegal, is too well settled by adjudicated cases to be questioned at this day. (*Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. R., 173; *People* v. *Fisher*, 14 Wend., 9; 4 Denio, 352; 5 id., 434; 44 N. Y., 87, and cases cited.)

Every producer or vender of coal or other commodity has

the right to use all legitimate efforts to obtain the best price for the article in which he deals. But when he endeavors to artificially enhance prices by suppressing or keeping out of market the products of others, and to accomplish that purpose by means of contracts binding them to withhold their supply, such arrangements are even more mischievous than combinations not to sell under an agreed price. Combinations of that character have been held to be against public policy and illegal. If they should be sustained, the prices of articles of pure necessity, such as coal, flour and other indispensable commodities, might be artificially raised to a ruinous extent far exceeding any naturally resulting from the proportion between supply and demand. No illustration of the mischief of such contracts is perhaps more apt than a monopoly of anthracite coal, the region of the production of which is known to be limited. Parties entering into contracts of this description must depend upon each other for their execution, and cannot derive any assistance from the courts.

The plaintiff, however, contends, that notwithstanding the illegality of the stipulation of the Butler Colliery Company not to sell coal to other companies, he is still entitled to recover for the coal actually delivered to the defendant.

The coal was, as found by the referee, delivered under the illegal contract. The purpose of the vendee was against public policy, and the vendor knew it. This brings us straight to the question, whether the vendor, delivering goods under such a contract, can recover for the price. I think that under the circumstances of the present case, as found by the referee, he cannot. If an absolute purchase had been made by the defendant of the Butler Coal Company of any specified quantity of coal, or even of all the coal which the Butler company could produce, that contract would have been legal, notwithstanding that the object of the purchaser was to secure a monopoly and that the vendor knew it. He had a right to dispose of his own goods, and (under certain limitations) a vendor of goods may recover for their price, notwithstanding that he knows · that the vendee intends an

improper use of them, so long as he does nothing to aid in such improper use, or in the illegal plan of the purchaser. This doctrine is established by authority, and is sufficiently liberal to vendors. But — and this is a very important distinction — if the vendor does any thing beyond making the sale, to aid the illegal scheme of the vendee, he renders himself *particeps criminis*, and cannot recover for the price. (*Tracy* v. *Talmadge*, 14 N. Y., 162.)

Now, to apply these principles to the case before us. If the Butler Colliery Company had sold to the defendant any specified number of tons of coal, or even the whole product of its mines, it had the right so to do and could recover for the price agreed upon, even though it knew that the object of the purchaser was to obtain a monopoly of the article. But when it agreed to sell only a part of its product to the defendant, and stipulated in the same agreement, and as part thereof, that it would not sell the residue to any other party to go north, knowing that the object of the defendant was to create a monopoly, and that such stipulation was intended as one of the means of averting competition, it made itself a party to the illegal scheme of the defendant. These mutual engagements cannot be separated. It is perfectly patent that one was the consideration for the other, and that the defendant would not have bought the coal in question unless the Butler company had agreed to aid it in preventing competition.

The illegality of the contract seems, by the opinion of the referee, to have been admitted by the parties when the case was submitted for his adjudication. In his opinion, which shows that he fully comprehended the subject, he yielded with apparent reluctance, to a decision of Assistant Vice-Chancellor HOFFMAN, in *Jarvis* v. *Peck* (Hoff. Ch., 479). The question presented in that case was different from the one now before us. The question there was, whether, when a bond and mortgage were given for two considerations, one legal and the other illegal, the bond and mortgage could be sustained on the legal consideration? Assistant Vice-Chancellor HOFFMAN argued, that, if the legal consideration was sufficient,

the illegal one might be disregarded. Chancellor WALWORTH approved the result, on the ground that both covenants were legal. I do not think that this case throws much light upon the present one. The principle of Assistant Vice-Chancellor HOFFMAN's decision seems to have been considerably shaken, to say the least, in the case of *The Saratoga Bank* v. *King* (44 N. Y., 87). It is difficult to reconcile those cases.

At the General Term the judgment of the referee was sustained upon two grounds; first, that the illegal provision of the agreement was independent of, and separate from, the legal part. This point has I think been sufficiently discussed. The second ground is, that the Butler Colliery Company, after having made the first month's delivery under the contract, rescinded it and refused to carry it out, and that this action is not upon the contract, but in disaffirmance of it, and to recover the value of the property which the defendant has obtained under it. This position introduces a new phase of the case. If the Butler company made the contract understandingly, as found by the referee, it is difficult to see how it could acquire any greater rights against the defendant by breaking it, than it would have had by keeping faith and performing it. To meet this difficulty it is suggested that the Butler company never made the illegal agreement. That it was made by an agent who exceeded his authority, and that when it came to the knowledge of the company it repudiated and disaffirmed it, and that this action is in disaffirmance of the contract. This position is not sustained by the facts. The action is not in disaffirmance of the contract. If the contract were rescinded, there would be no sale of the coal, and the claim of the Butler Coal Company would be for its re-delivery, or for damages for the conversion. But such is not the character of this action. The present plaintiff could not maintain such an action. He has no title to the coal, but is simply assignee of the claim of the Butler Coal Company for bill of coal sold and for advances made under the agreement. The complaint avers the sale and delivery of the coal at an agreed price, and claims to recover that price,

together with certain advances made at defendant's request, less certain commissions, all of which claims, as the evidence and findings show, conform to the provisions of the contract. The plaintiff alleges in the complaint the assignment to him of this indebtedness, and thus seeks to enforce the claim of the Butler company so far as it had accrued under the contract, up to the time when it repudiated the obligations on its part which were favorable to the defendant. The case of *Peck* v. *Burr* (10 N. Y., 294) is, I think, an authority directly adverse to the position of the plaintiff, and shows that no recovery can be had for the partial performance of an illegal contract, rescinded or repudiated after such part performance. (See, also *Knowlton* v. *Congress and Empire Spring Company*, 57 N. Y., 518, 530.)

But, furthermore, the referee did not rest his judgment on any such ground as now suggested, nor do his findings justify such a ground. He finds that the contract was made by the Butler Colliery Company. That it knew that the purpose of the defendant in making it was to obtain a monopoly of coal in the Elmira market and prevent competition therein, and that, but as a means of accomplishing that purpose, it would not have made the contract. He finds that the coal was delivered pursuant to that contract; that after its delivery the Butler company refused to deliver any more coal to defendant, and made sales to other parties north of the stipulated line. But there is no finding that the Butler company rescinded the agreement on the grounds of its illegality, or of any want of power in its agent to make it. The finding is that the rescission and refusal to perform were without reason or excuse. Upon these findings we do not think the alleged rescission gives the plaintiff any better right to recover for the part performance, than he would have had if the Butler company had performed all its stipulations.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

All concur; MILLER, J., not sitting.

Judgment reversed.