STRAIT *et al. v.* NATIONAL HARROW CO. *et al.*

(*Supreme Court, Special Term, Broome County.* January, 1891.)

1. ILLEGAL CONTRACT—PARTY ASKING RELIEF.
    The court has power to and will relieve.a repentant party to an illegal contract. while it remains executory.
2. SAME—TRUST COMBINATIONS ENGROSSING THE MARKET.
    A combination of all the manufacturers in the United States of an implement nec-- essary to agriculture, which absolutely regulates prices and controls production, is restrictive of competition, and an illegal conspiracy. A contract made to effect- such purpose is illegal and void. The combination is not protected because organized as a corporation under a state statute.
3. SAME.
    Whether a corporation can be organized under the manufacturing acts of the state where the objects authorized by the acts are incidental only to the main purpose of its incorporation, *quære.*
4. SAME—OWNERS OF PATENTS.
    The combination is not made legal because entered into by the owners of patents, which patents alone are the subject of the combination, where the combination is to extend for 50 years beyond the life-time of any patent.
5. SAME.
    Whether the owners of patents may, by virtue of their exclusive rights under the federal statute, form a combination or trust as to those patents limited to the life-time of those patents, *quære.*

(*Syllabus by the Court.*)

Action by William Strait and others against the National Harrow Company and others. The defendant the National Harrow Company is a corporation organized under the laws of the state of New York in September, 1890, for the purpose, as expressed in its certificate, "of conducting and carrying on the manufacture and sale of float spring tooth harrows and other agricultural implements." Its capital stock was to be $500,000. On November 10, 1890, these plaintiffs, consisting of a partnership doing business under the name of the Clipper Chilled Plow Company, at Elmira, together with the defendant the National Harrow Company, signed the following papers:

"EXHIBIT A.

"Memorandum of contract between the National Harrow Co., of the first part, and sundry persons, firms, and corporations, party of the second part, as follows:

"Whereas, the National Harrow Co., a corporation, has been organized for conducting throughout the United States the float spring tooth harrow business, through its agents and licensees; and whereas, the undersigned were, in the season of 1890, and are now, engaged in manufacturing and marketing float spring tooth harrows, and are each the owners of patents relating thereto, and are each desirous of transferring their business and patents relating to float spring tooth harrows to the National Harrow Co., and agree not to be directly or indirectly interested in the manufacture or sale of float spring tooth harrows, or allow them to be manufactured or sold in any building controlled by them, or either of them, thereafter in the United States, or any territory thereof, except Montana, and except as agents and licensees of the National Harrow Co., and to receive in payment therefor paid-up stock of the said corporation, for the value of the business, good-will, patents, etc., and to accept uniform licenses containing uniform provisions, by which they are to receive a license from said corporation, under all patents which it may own, to manufacture and sell the same kind of float spring tooth harrows which each of said firms are now manufacturing and marketing, as agents and licensees of the National Harrow Co.: Now, therefore,

in consideration of one dollar, each to the other paid, and the mutual advantages and benefits to be derived therefrom, it is agreed as follows:

"*First.* The National Harrow Co. agrees to purchase the business, good-will of the business, all patents now owned or which may hereafter be owned, all licenses and rights under patents relating to the manufacture and sale of float spring tooth harrows in the United States: providing, always, that each of said persons, firms, and corporations who hereafter sign this agreement shall agree in said general assignment of the business, good-will of the business, trade-marks, labels, designs, patents, and pending applications for patents relating to float spring tooth harrows; that the parties will not for the period of fifty years be engaged in the manufacture or sale of float spring tooth harrows in any of the territories of the United States except Montana, except as agents and licensees of the National Harrow Co.; and the National Harrow Co. agree to issue paid-up stock of the corporation for the value so transferred, to be agreed upon or settled by arbitration.

"*Second.* The National Harrow Co., upon the execution and delivery of said transfer by the persons, firms, and corporations, parties hereto, shall, as soon thereafter as the papers can be executed, appoint as agents and license each of the persons, firms, and corporations, parties hereto, the rights as agents and licensees of the National Harrow Co. to use and employ all of the trade-marks, labels, designs, etc., theretofore used by each firm respectively, but now owned by the National Harrow Co., which were transferred to it by the person, firm, or corporation who transferred the same, authorizing the same person, the same firm, and the same corporation to build and market the same style and construction of float spring tooth harrows which the person, firm, or corporation was engaged in building and marketing just prior to the sale by him, they, or it to the National Harrow Co., and upon condition that such person, firm, or corporation shall pay, at uniform times with all other agents, to the National Harrow Co., one dollar on account of each and every float spring tooth harrow sold and delivered after September 1st, 1890, and to comply with all of the requirements of the board of directors of the National Harrow Co. with reference thereto, which requirements shall be uniform with all other agents and licensees; it being understood that each person, firm, or corporation who transfer their business and their property relating to float spring tooth harrows to the National Harrow Co. shall be entitled to receive and enjoy the same terms of agency and license, subject to the same terms and conditions, as every other agent and licensee of the National Harrow Co., except in the particular style of harrows which each person, firm, or corporation is entitled to manufacture and sell under the terms of said uniform license; and each license to each agent of the National Harrow Co. shall be exclusive, and the National Harrow Co. shall not manufacture and sell, and no agent and licensee shall be licensed or authorized to build the same style and construction of harrows that another agent and licensee is authorized to manufacture, unless they were manufacturing such harrows just prior to their assignment to the National Harrow Co.; the intent being that each person, firm, and corporation who are appointed agents and licensees of the National Harrow Co. shall be licensed to manufacture the same harrows that they were manufacturing just prior to their respective assignments to the corporation, and such other harrows as the National Harrow Co. may specifically designate by its agency and license to build in any specific territory; but such agency, license, and territory shall be uniform to all.

"*Third.* In case it shall at any time be deemed to the mutual advantage of the agents and licensees of the National Harrow Co. to dissolve the corporation, and nine directors shall so vote by resolution, then, and in that event, the corporation shall cancel all existing agencies and licenses, and shall execute and deliver to each person, firm, or corporation a retransfer of all the interests which were transferred to the National Harrow Co. by the person,

firm, or corporation to whom the retransfer is made, and the corporation shall then be wound up, and each stockholder shall surrender his stock, and execute and deliver a release of all claims against the corporation; and any sum of money that may remain after the payment of debts of the corporation shall be divided among the stockholders according to the amount of stock which each interest holds *pro rata*, and no acknowledgment of the validity of any patent shall be of any force or effect thereafter; the intent being that each interest shall stand after said dissolution upon the same ground, with reference to their respective interests, as they did prior to the execution of this contract, so far as the same can be carried out.

"*Fourth.* Each person, firm, and corporation who sign this agreement agree that they will not contest the validity of any patent owned by the National Harrow Co., either as to novelty or infringement; and that they will not be interested, directly or indirectly, in contesting the said patents owned by the National Harrow Co. during the existence of said corporation.

"*Fifth.* It is mutually agreed by the National Harrow Co., party of the first part, and the persons, firms, or corporations signing this agreement, parties of the second part, that in case of any difference arising with reference to the value of the business, good-will of the patents, etc., of either or all of the parties constituting the party of the second part and the National Harrow Co., or any other differences relating thereto, all of such differences shall be adjusted by arbitration. The National Harrow Co. shall select one arbitrator, and the persons, firm, or corporation constituting the party of the second part shall choose one arbitrator, treating all interests as one; and the two arbitrators shall hear the statements and allegations of the National Harrow Co., and of the respective persons, firms, and corporations forming the party of the second part, whose interests in the distribution of the capital stock of said corporation shall be treated in the aggregate, leaving the respective parties to adjust the proportion of stock between themselves; and, should the two arbitrators thus chosen, after hearing the statements and allegations of the parties, fail to agree, they shall then and in that event choose a disinterested umpire, in no way connected with the business interests of either party, and the two arbitrators first chosen shall then submit their differences, with their statements and allegations, to the umpire; and the decision of any two of the three arbitrators shall be binding, and the award shall be made accordingly, and shall be carried into effect, and the National Harrow Co. shall be at liberty to deliver the certificates of the paid-up capital stock of the corporation to the arbitrator chosen by the parties forming the party of the second part, to be received by him in full payment of all interests transferred, and held by him in full payment for the interests transferred to the National Harrow Co., and the arbitration shall be a condition precedent to any right of action to recover said stock of the National Harrow Co.

"*Sixth.* The parties signing this agreement are each, upon request, to execute and deliver a general assignment of their business, good-will, and patents, containing an agreement not to be interested in the float spring tooth harrow business for the period of fifty years, and also formal assignments of patents and pending applications for patents for record in the patent-office.

"*Seventh.* This contract shall be deemed a continuing one, and shall apply to and bind the parties, the heirs, representatives, successors, and assigns, during the existence of the said National Harrow Co.

"*Nov.* 10, 1890.                THE NATIONAL HARROW CO.   [L. S.]
          [L. S.]                          "By CHAS. H. CHILDS, Prest.
                              "CLIPPER CHILLED PLOW CO.   [L. S.]
                                          "W. STRAIT."
                         "EXHIBIT B.

"Whereas, the Clipper Chilled Plow Co., a copartnership doing business at Elmira, in the state of New York, is engaged in the manufacture and sale of

float spring tooth harrows, and said firm is composed of Elijah B. Smith, Mr. Wm. Strait, and Hezekiah J. Mix, and are the owners of, or have an interest in, several patents of the United States relating to float spring tooth harrows, and under some one or all of said several patents it is now manufacturing and marketing float spring tooth harrows; and whereas, the National Harrow Co., a corporation duly organized under the laws of the state of New York, is desirous acquiring the entire right, title, and interest in and to all patents owned or held, or in which the Clipper Chilled Plow Co., or any officers or trustees of said corporation, may have or hold an interest, and in and to all patents now pending in the patent-office, and all that it may hereafter obtain or be interested in, legally capable of being assigned, relating to float spring tooth harrows, and also to acquire the good-will of the said copartnership and of members, officers, and directors in the manufacture and sale of float spring tooth harrows, and all rights of trade-marks, labels, or other designs used and employed in said business of float spring tooth harrows, or in any way relating to said float spring tooth harrow business, as fully and as completely as the same can be sold and assigned to the said National Harrow Co., together with all rights and privileges connected therewith: Now, therefore, in consideration of the premises, and of one dollar each to the other paid, the receipt whereof is hereby acknowledged, and of the mutual benefits to be derived from the faithful performance of all the stipulations and conditions herein expressed, it is agreed as follows: The Clipper Chilled Plow Co., of Elmira, N. Y., party of the first part, in consideration of the premises before mentioned, and of the sum of one dollar paid by the National Harrow Co., party of the second part, the receipt whereof is hereby acknowledged, each to the other, and the agreement to issue and deliver paid-up stock of the National Harrow Co. for the value of the patents and pending applications, business, and good-will of the business, to hereafter be agreed upon or fixed by arbitration, and, when agreed upon or fixed by arbitration, the said stock is then to be issued and delivered to the Clipper Chilled Plow Co., of Elmira.   The party of the first part hereby sells, assigns, transfers, and sets over to the National Harrow Co., party of the second part, its successors and assigns, all their right, title, and interest in and to all patents relating to float spring tooth harrows, issued and pending, in which it or any of its officers or trustees may now or hereafter have an interest; and it agrees that it will execute separate formal assignments thereof, upon request, for the purpose of record; and the Clipper Chilled Plow Co. hereby assigns the good-will of its float spring tooth harrow business, trade-marks, and the right to continue the further manufacture and sale of float spring tooth harrows, except as agents and licensees of the National Harrow Co., to the said National Harrow Co., and to its successors and assigns, to have and to hold the same forever.   The party of the first part hereby agrees to receive in payment for said sale and transfer paid-up stock of said National Harrow Co. to the amount at the par value of the stock hereinafter agreed upon to be received, or fixed by arbitration.   In consideration of the purchase by the said National Harrow Co. of the said patents and good-will of the business of the said Clipper Chilled Plow Co., of Elmira, manufacturers and dealers in float spring tooth harrows, and of the payment of the price stipulated to be paid, the said Clipper Chilled Plow Co., of Elmira, agrees that it will not at any time or times within the period of fifty years, directly or indirectly, engage in the manufacture or sale, or be interested, directly or indirectly, in any manner, form, or shape whatsoever, in the manufacture and sale of float spring tooth harrows, or allow the same to be manufactured in any building controlled by it, (except in the capacity of agent and licensee of the National Harrow Co.,) within any of the several states of the United States of America excepting Montana, or within any of the territories thereof, or within the District of Columbia, or be directly or indirectly interested in importing, for the purpose of marketing in the terri-

tories aforesaid, any float spring tooth harrows, within the period and territory aforesaid, and any manufactory carried on in the state which is excepted from this transfer, if there be any, shall not authorize or sanction the use or sale of float spring tooth harrows outside of the state of Montana for the period aforesaid; and for value received it agrees that it will not contest the validity of any patents owned, or that may be owned, by the National Harrow Co., as to novelty or infringement, or encourage others so to do. This obligation shall apply to and bind the respective parties, their successors and assigns, and the officers of said copartnership.

"Witness our hands and seals, this 10th day of Nov., 1890.

"CLIPPER CHILLED PLOW CO.   [L. S.]<br>"Per STRAIT.

"In presence of EDWIN H. RISLEY."

"In consideration of the sum of one dollar, to us in hand paid, the receipt whereof is hereby confessed, the Clipper Chilled Plow Co., of Elmira, in the state of New York, agrees to and with the National Harrow Co. that the said Clipper Chilled Plow Co. will perform all of the obligations and stipulations contained in the annexed contract to be performed by it, and, in default of its performing the same, within the language and spirit thereof, it acknowledges itself to be justly indebted to the National Harrow Co. for and on account of all damages growing out of said breach or breaches, if any there be, and, in addition thereto, the further sum of ten thousand dollars, ($10,000,) fixed and liquidated damages, to the National Harrow Co., its successors and assigns, for which payment well and truly to be made it binds itself, its successors and assigns, jointly and severally, firmly by these presents; and it consents that any breach or breaches of said obligations on the part of the Clipper Chilled Plow Co., of Elmira, or its officers, obligee, may be restrained by injunction, and waive thereby the right of trial by jury.

"Sealed with our seals, and dated this 10th day of Nov., 1890.

"CLIPPER CHILLED PLOW CO.   [L. S.]<br>"STRAIT.

"In presence of EDWIN H. RISLEY."

"EXHIBIT C.

"Memorandum of agreement, made this 2nd day of October, 1890, between the Clipper Chilled Plow Co., of Elmira, of the first part, and the National Harrow Co., of the second part, as follows:

"Whereas, the party of the first part has this day entered into a contract with the National Harrow Co. for the transfer to the National Harrow Co. of their float spring tooth harrow business, patents, pending applications for patents, rights and privileges under patents relating to float spring tooth harrow business, including trade-marks, labels, designs, connected with said business and pertaining thereto, and have agreed to accept in payment for the interest transferred paid-up stock of the National Harrow Co. in an amount to be hereafter agreed upon by the parties, or, in case of their inability to agree, then to be fixed by arbitration as provided: Now, therefore, in consideration of one dollar each to the other paid, the receipt whereof is hereby acknowledged, and of the mutual benefits to be derived, it is agreed as follows:

"*First.* That, in case the parties hereto are unable to agree between themselves upon the value of the property transferred, and of the amount of capital stock to be issued in payment therefor, then, and in that event, all such differences are to be settled by arbitration.

"*Second.* The party of the first part hereby appoints William Strait as its arbitrator, to represent its interests; and the party of the second part hereby names and appoints Edwin H. Risley, of Utica, N. Y., as arbitrator to represent its interests in said arbitration. The two arbitrators thus selected shall look over the whole matter, and agree upon the amount of capital stock to be

issued in payment for the interests transferred to the National Harrow Co., and hear such allegations and statements relating thereto which either party may desire to make, and they shall then proceed to fix and determine the amount of capital stock which shall be issued to the party of the first part by the National Harrow Co. in payment for the interest transferred; and, in case they are unable to agree upon the amount to be paid, then, and in that event, they shall choose a disinterested arbitrator, in no way connected with any of the agents and licensees of the National Harrow Co. or with either of the parties, and they shall then submit their respective views to said third arbitrator, and the points in dispute, and the decision of any two of said arbitrators shall be binding upon all of the parties, and their award in writing shall be made, and the National Harrow Co. shall issue paid-up stock to the amount fixed and determined by the arbitrators thus chosen. This arbitration, if it shall go into effect, shall be taken up and the matter disposed of in connection with the other arbitrators, and the value be fixed with reference to the interest of the other agents and licensees who may transfer their business, etc., to the National Harrow Co., to the end that an equitable division may be reached, reference being had to all the interests involved in the corporation; and the award shall be made within ten days after the final submission of the matter to the arbitrators, should arbitrators be found necessary. The party of the first part shall not maintain an action against the corporation of the National Harrow Co. to fix the value of said stock, unless the corporation of the National Harrow Co. shall refuse or neglect to proceed with the arbitration, or refuse to carry out the same within a reasonable time; and the arbitration shall be completed prior to Sept. 1, 1891.

"Witness our hands and seals this 10th day of Nov., 1890.

"THE NATIONAL HARROW CO. [L. s.]
"By CHAS. H. CHILDS, Prest.

[L. s.]

"CLIPPER CHILLED PLOW CO. [L. s.]
"W. STRAIT."

These plaintiffs had theretofore manufactured a harrow consisting of part wood and part steel, and desired, before entering into the contract expressed in the above writings, to obtain a license from the National Harrow Company to build and market an all-steel frame harrow, as well as the harrow they were then manufacturing and marketing. This license could only be granted by the executive committee of the National Harrow Company, and until that committee should meet and determine to grant or refuse such license to these plaintiffs these papers were left with defendant Risley in escrow; whereupon the defendant Risley gave to the plaintiffs, with the consent of the defendant the National Harrow Company, and acting for them, the following papers:

"EXHIBIT D.
"UTICA, N. Y., Nov. 10, 1890.

"*Clipper Chilled Plow Co., Elmira, N. Y.*—GENTS: This will acknowledge that you have delivered into my possession three documents, executed in duplicate, relating to your firm going into the National Harrow Co., and two sections of float spring tooth harrows, which it is desired that the National Harrow Co. license you to manufacture under the agreements signed by your firm and the license of the company, which, if the National Harrow Co. granted to your company the right to manufacture and market duplicates of the two samples, then the papers held by me shall be delivered to the treasurer of the National Harrow Co., and they shall be binding; and, should the directors agree to license the wood frame and not the steel frame harrow, then the papers, upon request, are to be delivered up to you for cancellation, and are not to be operative, unless you elect to make them so. In the mean time your firm are to sell your harrows at the schedule prices fixed by the National Harrow Co., a price-list being furnished your Co., and your com-

pany is expected to cancel all orders for harrows where the prices are below schedule rates, where the number of harrows are not fixed in the order, where the same were taken subsequent to Sept. 10, 1890, unless the parties giving the open orders will consent to take the harrows on the open orders at the schedule price, or above such prices; and all orders now taken, where the prices are more favorable than those fixed by the company, are to be filled at the prices at which the orders were taken, but no future orders are to be taken on more favorable terms than those fixed by the company until after the meeting of the executive committee to pass upon the steel frame harrow, and determine whether or not the same shall be licensed. I am to hold the papers under the foregoing conditions.

"Yours, truly,                                        EDWIN H. RISLEY."

"EXHIBIT E.

"Prices and terms fixed by the National Harrow Co., this 10th day of September, 1890, are as follows:

| | |
|---|---|
| 14-tooth steel frame and wood frame plated harrows | $23 00 |
| 16-tooth wood frame, plain | 21 00 |
| 16-tooth steel frame and wood frame, plated | 23 00 |
| 18-tooth wood frame, plain | 23 00 |
| 18-tooth steel frame and wood frame, plated | 25 00 |
| 20-tooth wood frame, plain | 25 00 |
| 20-tooth steel frame and wood frame, plated | 27 00 |
| 22-tooth steel frame and wood frame, plated | 28 00 |
| 24-tooth wood frame, plain | 30 00 |
| 24-tooth steel frame and wood frame, plated | 32 00 |

"For harrow frames complete, less teeth, as follows:

| | |
|---|---|
| 14-tooth frame | $14 00 |
| 16-tooth frame | 14 00 |
| 18-tooth frame | 16 00 |
| 20-tooth frame | 18 00 |
| 22-tooth frame | 20 00 |
| 24-tooth frame | 20 00 |

"Intermediate sizes of harrows or frames shall be sold at the price of the next highest size.

"Single tooth                                        $0 75

"A maximum discount of forty-two (42) per cent. may be allowed on sales of harrows, frames, and teeth in the following territory: All of the New England states; also states of New York, Pennsylvania, New Jersey, Delaware, Maryland, Virginia, and West Virginia.

"A maximum discount of forty-five (45) per cent. may be allowed on all sales made in the territory throughout the United States not mentioned above.

"Freight may be allowed to nearest railroad station or steam-boat landing.

"Terms on sales made prior to June 1st, four months from June 1st, less ten (10) per cent. discount for cash June 10th.

"Terms of sales made after June 1st, four months from September 1st, less ten (10) per cent. discount for cash September 10th.

"Agents and licensees may sell harrows at retail to the local users of harrows at their respective places of business only, but not less than the net schedule prices named to the dealers."

The plaintiffs bring this action to be relieved from the aforesaid contracts upon two grounds: *First*, the breach of a condition of the contract by the defendant corporation; *second*, the invalidity of said contract, as *ultra vires*, without consideration, and against public policy. The defendant defends the action, claiming that the contracts were valid, and asserts a counter-claim, alleging that the plaintiffs have violated the stipulation set forth in Exhibit D, and asking for an injunction restraining such violation. Further facts appear in the opinion.

*Youmans, Moss & Knipp*, (*E. C. Sprague, Roswell R. Moss*, and *Frederick Collin*, of counsel,) for plaintiffs.   *Risley & Perry*, (*Edwin H. Risley, H. J. Cookingham, Milton E. Robinson*, and *William P. Quinn*, of counsel,) for defendants.

SMITH, J.  I cannot find, as is claimed by the plaintiffs, any stipulation on the part of the defendant corporation to grant the license mentioned in Exhibit D within three weeks from November 10th.  The licenses were to be granted when the sample harrows were all in.  It was understood by the parties that the time would be short when these samples would be before the executive committee, and the question of license could be passed upon.  I have no doubt that a specified time was there mentioned, but it was not, in my judgment, a part of the contract; and the committee, having met upon the same day that the last sample harrow was received, have acted within a reasonable time, which fulfills the requirement of the law.  Upon December 16th, after the commencement of this action, the committee did meet, and assume to license the plaintiffs in accordance with the memorandum Exhibit D.  The license delivered to them, strictly construed, is not, in my judgment, such a license as is required by the contract.  But the plaintiffs had theretofore notified the defendant that they would not abide by the contract.  The defendant corporation here asserts that it is willing and anxious to fulfill the terms of the contract, and grant such license as is therein required.  A resolution to that effect was by the executive committee passed December 16th.  The defendant should not, therefore, be foreclosed, by reason of the mistake of its attorney in preparing the form of the license, but the decree should provide, if these contracts are valid, that they be operative upon the making out of the proper license under the contract.

The plaintiffs' claim that the contract was induced by duress is not within the pleadings.  Nor can the court grant the plaintiffs relief upon the ground that the corporation is not a legal corporation, because organized for a purpose not within the statute.  It is a serious question whether a corporation can organize under the manufacturing act, for a purpose within that act, as incidental only to the main purpose of its organization.  But, even if that question could be raised by the plaintiffs in such an action as this, it is a claim of which the defendant has had no notice by plaintiffs' complaint, and is therefore not before the court for consideration.

Nor can the plaintiffs sustain this action because defendant corporation has acted beyond its powers, or has made contracts with other corporations which were without power to enter into such contracts.  These plaintiffs can have no better right than could a subscriber for the stock of a corporation in an action upon such subscription.  In such an action it is settled law that the subscriber cannot defend on the ground of the misuse or abuse by the corporation of its corporate powers.  Mor. Priv. Corp. (1st Ed.) §§ 312, 313, and cases cited in notes.  The contract of plaintiffs was with the defendant corporation.  These other corporations are not parties to the contract sought here to be annulled; nor are their contracts with defendant any part of the legal consideration of plaintiffs' contract.  It does not lie with plaintiffs, therefore, to say that, because the corporate authorities have made void contracts with other corporations, plaintiffs can refuse to perform their contract.  There is grave doubt if the plaintiffs' contract with defendant could be in any way affected by the Michigan statutes.  The decisions of the supreme court of the United States would seem to go far to hold that the plaintiffs might sell their harrows in the state of Michigan, unaffected by the Michigan statute.  What effect the statute would have upon contracts between the defendant and Michigan corporations, I have held, was not a matter of concern to the plaintiffs in this action.  These plaintiffs, therefore, have no cause of complaint, unless the contract made is an illegal contract, as

hostile to the public good. I need hardly cite authorities to the effect that the court will relieve a repentant party from an illegal contract that has not been executed. It would be strangely inconsistent for the court to refuse to relieve a party from a contract for the execution of which it would punish him. This case is clearly distinguishable from that of a party asking relief from the court based upon an illegal contract executed in whole or in part. The single question remains, therefore, of the legality of the proposed contract.

It appears from the evidence that for the purposes for which harrows are used the float spring tooth harrow has practically monopolized the market. By reason of its superiority it has driven from the field nearly all of its competitors. It appears, further, that the defendant corporation has made contracts, similar to the one set forth in Exhibits A, B, and C, with 19 other firms and corporations, which, with the plaintiffs, comprised all of the manufacturers of float spring tooth harrows in the year 1890 within the United States. By the contracts these manufacturers assumed to sell to the defendant corporation "their business, the good-will of the business, all patents now owned or which may hereafter be owned, all licenses and rights under patents relating to the manufacture and sale of float spring tooth harrows." They took back from the defendant corporation the exclusive right to manufacture the style of harrow they were manufacturing at the time of entering into such contracts. The defendant's rights, therefore, under such contracts, are only to manufacture under patents which have been by the manufacturers discarded. The firm of G. B. Olin & Co. have assigned its patents to the defendant for cash value, without taking back such a license as is provided for in the other contracts. I do not understand that under the purchase from Olin & Co. the defendant gets the right to manufacture any harrow under any valuable patent to which it has not given the exclusive right to manufacture to other licensees. It was assumed and stated upon the trial that the incorporators and trustees of this National Harrow Company are all persons who are represented in the various manufacturing firms thus contracting with the defendant. It is apparent, therefore, that it is not one of its purposes itself to manufacture harrows for sale upon the market. It is claimed further that it has an ultimate object to manufacture materials for harrows for use by its licensees. But such an object is manifestly an incidental one only, if it exist at all, and is evidently a purpose entertained to avoid the objection that the purchase by corporate licensees of stock in the defendant corporation is void, as beyond their corporate powers. The purposes of this incorporation are only important in this case as they bear upon the ends sought to be accomplished by these contracts.

All manufacturers, then, of float spring tooth harrows in the United States have agreed, by the papers executed, not to be directly or indirectly interested in the manufacture or sale of float spring tooth harrows, or allow them to be manufactured or sold in any building controlled by them, or either of them, in the United States, or any territory thereof, except Montana, for 50 years, and except as agents and licensees of the National Harrow Company. They have transferred to the defendant company all the patents owned by them, or which may hereafter be owned by them. They have agreed that for 50 years they will not manufacture or sell any harrow except such as they are now manufacturing. By this contract, for 50 years they are not permitted to avail themselves of any devices under patents other than those under which they now manufacture, even after the expiration of such patents. This limitation which they have assumed is not for the protection of the defendant company, to which they have sold their patents. The defendant has covenanted for 50 years not to manufacture under all that is valuable of the present patents, to-wit, those patents under which their licensees are now manufacturing. Nor are these manufacturers permitted to utilize any new in-

ventions which they may make, or any new patents of which they may ac-
quire control. Not only have they crippled themselves, but they have agreed
not to allow to be manufactured in any building controlled by them, or either
of them, in the United States, except Montana, any harrows except those
that they shall manufacture. And it is further stipulated that these manu-
facturers shall comply with all of the requirements of the board of directors
of the National Harrow Company with reference to their sales, which require-
ment shall be uniform with all agents and licensees. The contract can re-
ceive no other construction. The defendant itself has so construed it. Un-
der this stipulation this defendant has assumed to fix the prices and terms for
the sale of harrows by these manufacturers, as set forth in Exhibit E. These
prices are not based upon the cost of manufacture, but are to be uniform with
all manufacturers upon a certain style of harrow. But this stipulation is a
very broad one. As practically construed by the defendant, it gives the de-
fendant absolute power to regulate the prices at which these harrows shall be
sold; to raise or lower them at pleasure. It may fairly be construed to give
to this defendant the absolute power to control the manufacture, as well as
the sale, of the harrows; to regulate the production, subject only to the condi-
tion that the requirements of the defendant's board shall be uniform with all
manufacturers. It is claimed by the defendant that the price fixed is less than
the price at which harrows had been theretofore sold. It is true that it is less
than the price at which the majority of harrows had been theretofore sold. It
is considerably in excess, however, of the price at which others were sold, and
in excess of the price which the plaintiffs received for their harrows. But
there is nothing to prevent this defendant at any time from raising this price
at its will. It is hard to conceive how a monopoly could be more firmly in-
trenched, or how competition could be more effectively strangled. *People* v.
*Refining Co.*, (Sup.) 7 N. Y. Supp. 406. "The mischief of a monopoly is
not necessarily in the fact that the prices are raised, but that they have the
power to control and raise the prices." *Dolph* v. *Machinery Co.*, 28 Fed.
Rep. 553; *Butchers' Union Slaughter-House Co.* v. *Crescent City Live-Stock
Landing Co.*, 111 U. S. 755, 4 Sup. Ct. Rep. 652. In. *Hoffman* v. *Brooks*,
11 Wkly. Law Bull. 258, 259, it is said: "It is not averred that the prices
fixed are extortionate, but it is enough that they are absolutely removed
beyond the operation of their natural cause of fluctuation." See *Carbon
Co.* v. *McMillin*, (Sup.) 6 N. Y. Supp. 433, 119 N. Y. 46, 23 N. E. Rep.
530; *Hooker* v. *Vandewater*, 4 Denio, 349; *Stanton* v. *Allen*, 5 Denio, 434;
*Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 186; *Salt Co.* v. *Guth-
rie*, 35 Ohio St., 672; *Craft* v. *McConoughy*, 79 Ill. 346; *Arnot* v. *Coal Co.*,
68 N. Y. 558; and cases cited in the opinion of Mr. Justice DANIELS in *Peo-
ple* v. *Refining Co.*, *supra*, p. 412.

It is claimed that the courts have modified the rule as to contracts in re-
straint of trade. I find that that is true where an individual sells his busi-
ness and contracts not to engage therein within a territory as large even as
the United States. The courts now enforce such contracts. Our own court
of appeals has gone far, in the *Diamond Match Co. Case*, 106 N. Y. 473, 13
N. E. Rep. 419, in relaxing the severity of the ancient rule in condemnation
of such contracts as in restraint of trade; but I am cited to no case where the
courts have relaxed the rule where there was a general combination to en-
gross the market, control prices, and prevent competition. This was a con-
spiracy indictable at common law. It is made criminal by our own statutes.
The contract is not made to protect any purchase made by the parties thereto.
Unless the policy of the common law has so far changed as to authorize any
monopoly for the restraint of trade, this combination must clearly come within
its condemnation. The defendant further contends that the purpose of the
contract made is to prevent disastrous litigation. Such purpose is lawful.
But the combination effected has gone much further than such a purpose re-

quired. An unlawful combination cannot be cloaked by a lawful purpose, when that is associated with others which the law condemns. Nor can this defendant shield itself under its corporate rights. When the fact appears that the forms of law are being used to accomplish a legal wrong, a court of equity is potent to relieve a suitor, and, if necessary, to rend assunder the legal veil which covers the iniquity. The contracts, as interpreted by the court, however, are clearly beyond the powers of the defendant corporation as a legal entity, and it is not necessary here to adjudge the corporation illegal in order to annul a contract in excess of corporate power. Nor is the defendant's contention that the monopoly formed is authorized by the federal statute a justification of these contracts. If these contracts were limited to the life-time of these patents, the argument should not be dismissed without a serious consideration. But when the parties have assumed to contract for 50 years beyond the possible life-time of any of these patents, it is clear that the federal law has given no right to such monopoly. It follows, therefore, that the plaintiffs are entitled to the relief asked in the complaint, and that the injunction allowed the defendant upon its counter-claim must be vacated and set aside, and the defendant's prayer for relief denied.