Shauck, J.
On behalf of the plaintiff in error it is contended that its comprehensive stipulation to abstain everywhere from the manufacture of twine and rope of the character named in the contract is not an unreasonable restraint of trade, because it had used the leased machinery in the manufacture of binder twine to be sold in all the markets of the country, and that there could be no effective transfer of the good will of the business to the lessee, without a stipulation of this character. For this reason, it is insisted, the contract is not within the condemnation of Lange v. Werk, 2 Ohio St. 520; and that the stipulation being co-extensive with the interest to be protected, the contract is valid when tested by the doctrines of The Diamond Match Co. v. Roeber, 106 N. Y. 473 ; Hubbard v. Miller, 27 Mich. 15; Oregon Navigation Co. v. Windsor, 20 Wall. 64, and other cases of similar import.
But in these cases, as well as in Lange v. Werk, the stipulations held to be valid, because the restraints which they placed upontrade werereasonablein view ofthe circumstances andpurposes of their execution, were parts of contracts for the actual sale and transfer of property. The restraint was an incident to a transfer of property which, notwithstanding the transfer, was to be used for the purposes of trade and commerce. While this distinction may not be clearly stated, nor always observed, the principles of decision and the conclusion *621 reached in the numerous cases to which our attention has been directed, warrant the conclusion that every contract is void whose only purpose is to place a restraint upon trade, however narrow may be the field of its operation. “ A contract in restraint of trade is always void if nothing more appears.” Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Carroll v. Giles, 9 S. E. R. 422. That which must appear to impart validity to the stipulation which is prima facie void, is that in the transaction he, in whose favor the stipulation is made, has acquired an interest in the property or business, to which the restraint is such a reasonable incident that it ought to supersede the public interest to which it is inimical.
Therefore, in view of the allegations of the answer, the first question in logical order is: Was this contract not to manufacture anywhere, incident to a transfer of the machinery for the term indicated, or was that restraint the only purpose which the partiees had in view? In other words, is the covenant upon which the petition counts, really a covenant to pay rent, or to pay to the plaintiff the price for which it was agreed that it should cease to manufacture twine and rope of the character described?
Looking to the terms of the contract, the words employed by the plaintiff are appropriate to the leasing of property, and in a later provision the machinery described is referred to as “ said leased property.” The covenant upon which the petition counts is not to pay the $45,000 per annum as rent, but in later stipulations it is referred to as “ rental.” But the form of the contract is less important than its substance. That the parties did not intend that the machinery should pass into the control of the defendant is strongly suggested by the careful provision for its use by the plaintiff during the term for any purpose other than the manufacture of binder twine and rope of the character described, if the defendant should not be actually operating said machinery. That a lessee should pay so large a sum for the probable enjoyment of property by the lessor is not according to the usual course of deal *622 ing as -we- have observed it. The provision that the property-should be “ listed and the taxes thereon paid by the party in actual possession at the date when taxes attach and become a lien ” shows that the continued possession of the plaintiff was within the contemplation of the parties. Machinery which the plaintiff might subsequently purchase was as clearly subject to the lease as that which it then had. After reading the stipulation that the destruction of the machinery should not impair the defendant’s obligation to make the quarterly payments, it is difficult to believe that the use of the machinery was the sole or chief inducement to the covenant to pay; and that difficulty increases when one reads in the same connection that the defendant was not to be responsible for the care of the machinery when, during the term, it should be in possession of the plaintiff.
To the operation of the machinery, a building and power were necessary. The building was not leased, nor did the plaintiff undertake to furnish power. There was no provision for the removal of the machinery from the building, though a part of it was attached thereto. Nor was there any provision that, if the machinery should be removed, the plaintiff should have the use of the building and power elsewhere. It cannot be that the parties contemplated the joint or alternate use of the machinery, since the defendant could not operate it in the plaintiff’s building, and the plaintiff could not operate it elsewhere. Nor can it be that they contemplated its exclusive use by the defendant, since many of the stipulations look to its-use by the plaintiff. Nor does the contract fix any date at which the defendant may take possession. The plaintiff was to remain in possession until it had completed the orders described, within such time as it might choose, the only stipulation being that it should not manufacture in excess of those orders. A careful examination of the contract satifies us that the parties did not intend that the machinery should pass to the possession of the defendant, and the sole purpose was to-remove the plaintiff from the field of competition, and, so far- *623 .as it was concerned, to enable the defendant to limit the production and control the prices of binder twine and rope of the character described. . .
This conclusion is strongly confirmed by other evidence in the reeord. Among the facts which it establishes are some of much significance. At the time of the execution of this contract the defendant was the owner of a large number of mills engaged in the manufacture of the product described, and it was then engaged in a comprehensive scheme to get rid of its competitors. The contract was executed in the City of New York, and, within knowledge of the plaintiff's principal representative, there were then or near that time present in that city representatives of five Ohio mill's engaged • in the same production; one at Dayton, one at Miamisburg, two at Xenia, .and one at Zanesville; and one of the plaintiff's representatives assisted the defendant in the “ purchase of the spindles, drawing frames, spreaders, etc.,'' of a mill engaged in manufacturing the same product at Peru, Indiana. It resulted from these negotiations that these and two other Ohio mills entered into contracts with the' defendant; that the defendant did not in fact take possession of the machinery of any of said mills, but all of them ceased ‘to manufacture this product. Beginning three days after the execution of the contract, there was a voluminous correspondence between the plaintiff and the defendant, which related wholly to maintaining prices and closing the plaintiff's mill, the defendant insisting that it should be closed under the contract, and the plaintiff promising that it should be closed at the completion of the orders which, in the contract, it had reserved the right to fill: Possession of the machinery was not demanded by the defendant, nor mentioned by the plaintiff.
The machinery for which, according to the form of this contract, the defendant agreed to pay $45,000 per annum, would not, if new, have cost more than $65,000.
Other facts of less significance are shown, but there is nothing in the record, except the form of the contract, and the *624 terms therein employed, to suggest that it was contemplated by the parties, or either of them, that the possession of the machinery was to pass to the defendant as lessee. To the contrary, it is entirely clear, that the purpose of the contract was to destroy natural competition, to the great injury of the consumers of the product, and to create a monopoly to whose power other producers would be compelled to submit. That such an agreement is contrary to public policy’ and therefore void, is settled by numerous authoritative and well considered cases. Among them are The Morris Run Coal Co. v. Barclay Coal Co. 68 Pa. St. 173; Keeler v. Taylor, 3 P. F. Smith, 468; Arnot v. Pittston & Elmira Coal Co. 68 N. Y. 558 Craft v. McConoughy, 79 Ill. 346; Richardson v. Buhl, 77 Mich. 632; Santa Clara M. & L. Co. v. Hayes et al., 18 Pac. R. 391; Central Salt Co. v. Cuthrie, 35 Ohio St. 666; Emery et al. v. The Ohio Candle Co., 47 Ohio St. 320. The wisdom of these and many other like decisions is vividly illustrated in the public history of the times.
The legal character of this contract perhaps accounts for the allegations in which the defendant charges the plaintiff with its violation. Those allegations are wholly unsupported by the evidence. They are affectations of virtue, such as are frequently observed in the testimony of those who “ turn state’s evidence.”
Counsel for the plaintiff in error also insist that the trial court erred in overruling their objections to the evidence by which the defendant showed the negotiations between the parties, the execution of contemporaneous agreements between the defendant and other mill owners, and the subsequent correspondence and conduct of the parties touching the machinery and the business of the plaintiff. The. trial court was not concerned in ascertaining the rights and duties of parties arising out of a contract confessedly valid as against every consideration of public policy. It was chiefly concerned in ascertaining whether the contract had been entered into for purposes which a due regard to the interests of the public forbid. In its in *625 quiry and judgment it was not even restricted to tbe issues joined between the parties, for it was its duty to refuse to enforce the contract even though its validity was not challenged by either party. The materiality of the facts which this evidence tended to establish, is shown by the cases cited, and the competency of the evidence is thus made to appear.
Little & Spencer, for plaintiff.
Judson Harmon, for defendant.
But if in the mass of evidence admitted upon the trial there be some that is incompetent, it affords no sufficient ground for reversing the judgment. The case was tried to the court without the intervention of a jury, and its conclusion is justified by evidence whose competency cannot be seriously doubted. The record contains no evidence of questionable competency whose exclusion could have changed the result of the trial. Thayer v. Luce et al., 22 Ohio St. 62 ; Black v. Hill, 32 Ohio St. 313 ; Kilbourne v. Fury, 26 Ohio St. 153; Cook v. Penna. State Co., 36 Ohio St. 135.
The judgment will be affirmed.